UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY J. LONCZAK,

Plaintiff,

vs.

THE TOP-FLITE GOLF COMPANY,

Defendant.

CIVIL ACTION NO. 05-30180-KPN

**DEFENDANT THE TOP-FLITE GOLF
COMPANY'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

## I.    Introduction and Overview

Plaintiff, Gary J. Lonczak ("Plaintiff" or "Lonczak"), has filed a two count

Complaint, alleging that his 2004 termination was due to his age, in violation of the Age

Discrimination in Employment Act and M.G.L. c. 151B.  Defendant, following extensive

discovery by Plaintiff, has filed a Motion for Summary Judgment.

The undisputed evidence demonstrates that Lonczak had worked as an exempt

office employee working for Spalding Sports Worldwide, Inc. (hereinafter "Spalding"), a

global golf and sporting goods company, at its corporate headquarters in Chicopee,

Massachusetts, before that entity sold off large portions of its business and, soon

thereafter, filed for bankruptcy.  After the bankruptcy filing, at the beginning of

September 2003, Spalding's assets were auctioned off by order of the bankruptcy court.

Lonczak was one of 367 exempt office employees hired by The Top-Flite Golf

Company, a wholly owned subsidiary of Callaway Golf Company (hereinafter "TFGC" or

"Defendant") in mid-September of 2003.  TFGC was a new company established at the

time, after Callaway Golf Company ("Callaway") at auction, purchased many of

1

Spalding's golf business assets through TFGC.[1]  Like all but about twenty exempt salaried office employees hired by TFGC not involved directly in the golf ball manufacturing process, Lonczak's position was subsequently eliminated, and Lonczak was laid off, as the new company struggled to stop ongoing financial losses and integrate its remaining business with that of its new owner.[2]

The subsequent changes affecting office employees of TFGC have been pervasive, and the result of many business factors that do not implicate federal or state discrimination laws.  Thus, as one court noted, "…it is inevitable that when management changes so will some of the circumstances surrounding employment", changes not precluded by the ADEA, which "… is a discrimination statute and is not intended to handcuff the managers and owners of businesses to the status quo."  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3rd Cir. 1992).

It is obvious, and not indicative of a discriminatory intent, that changes would be all the more expected when the *status quo* had resulted in the prior company being forced, due to economic necessity, to sell off large portions of its business, its corporate name, and then still need to file for bankruptcy.  At a minimum, the new company would be expected to bring in some high level managers who had worked for a successful company that was the new owner, to replace those who, at a minimum, had overseen the predecessor's waning days.

---

[1]This is a somewhat abbreviated version of the corporate transactions that occurred in 2003.  The full scope of the changes is contained in the accompanying Statement of Undisputed Facts.

[2]The full scope of the changes affecting Defendant and Callaway employees are outlined in the Statement of Facts.  (Facts ¶¶1-48)

Moreover, personnel changes, in the form of a reduction of force, could be expected, and does not raise suspicion of a discriminatory goal, where the undisputed facts show that prior to its bankruptcy petition, and notwithstanding the divestiture of large portions of its business, Spalding's management team, although aware that its salaried exempt workforce was larger than necessary to support the remaining business, had elected not to effectuate staff reductions to match the size of its workforce to the size of its remaining businesses.

Significant layoffs become all but inevitable, and do not raise the specter of discriminatory intentions, when the newly formed company, after hiring virtually the entire Spalding workforce, found itself losing millions of dollars. Indeed, the record reveals that between its creation in September 2003 and the end of calendar year 2003, the Defendant lost nearly nine million ($9,000,000) dollars, and during the first quarter of 2004 it found itself on pace to lose even more. These losses clearly precipitated a need to effectuate cost reductions, including reductions in force amongst what was perceived to be a bloated exempt salaried staff.

Furthermore, the evidence shows that Callaway's original plans to have TFGC operate as a standalone business were modified, and ultimately largely abandoned. This occurred due to the continuing financial losses and to the fact that its chief proponent, Ronald Drapeau, Callaway's CEO at the time of the auction, was removed from his position in the summer of 2004.

The undisputed facts show that the integration of Defendant with its owner, Callaway, has, within three years, resulted in numerous changes affecting employees who had worked for Spalding prior to its bankruptcy. This included a plant closing of the

3

Ben Hogan facility in Texas and the movement of virtually all remaining corporate executive, managerial, financial, sales and marketing functions previously done in Chicopee for a far reaching golf and sporting goods company to Carlsbad, California, where Callaway is based.  The simple truth is that whereas prior to the spring of 2003 Spalding managed numerous business operations, and several off-site manufacturing facilities as well as International Divisions, from its Chicopee headquarters,  the local facility has become solely a manufacturing plant, managed by Callaway personnel in California.  This has resulted in Lonczak being one of literally hundreds of exempt office employees hired by TFGC in September 2003 to subsequently lose his position.  Of the 367 originally hired there are now only a total of 91, five of whom are in Research & Development and have received their layoff notifications.  Most of those 91 are engaged in the direct manufacture of golf balls; less than 20 are exempt office employees, as was Plaintiff prior to his layoff.  No one has been performing the duties previously performed by Plaintiff for a considerable period of time.

It is inevitable in such circumstances that some good employees, some of whom worked for Spalding for many years, would lose their positions.  It is inevitable that some of these individuals might be employees earning a high salary that was no longer justified.  It may be harsh, but it is an inescapable truism that TFGC, confronted with the economic realities, had absolutely no legal duty to minimize the disruption to the former Spalding employees.  TFGC was not legally obligated to make business and personnel decisions to enhance the job security of those that previously worked for a company that had gone bankrupt.  TFGC did not have to continue to retain former Spalding employees in their existing positions (often at considerable expense) if, after a transition

4

and assessment period, the new company concluded that it did not make business sense to do so.  Nor was the new company legally obligated to transfer employees into other positions, including lower rated and paid positions if such a position was all that remained necessary to run the new company, even if an employee targeted for layoff was able to perform the job.  Rather, TFGC's only legal obligation was to refrain from making decisions based on discriminatory factors, including age.  See Pages-Cahue v. Iberia Lineas Aereeas De España, 82 F.3d 533, 538 (1st Cir. 1996), Holt v. Gamewell Corp., 797 F.2d 36, 38 (1st Cir. 1986) citing, inter alia, Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982) (failure to retain and transfer not evidence of discrimination even if, "there were lower echelon, poorer paying jobs in the restructured enterprise which [appellants] were qualified to fill"), and Ridenour v. Lawson Co., 791 F.2d 52, 57 (6th Cir. 1986) (stating that "[w]here an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company").[3]

Lonczak's principal job responsibilities were planning and procurement for the BEN-HOGAN golf clubs being assembled at the Defendant's Ft. Worth, Texas plant.  In April 2004, when the decision was made to eliminate Lonczak's job, Callaway had decided to integrate the production of BEN HOGAN clubs with its own golf club

---

[3]"[A]n employer has no duty under ADEA to permit an employee to transfer to another position or displace workers with less seniority when the employee's position is eliminated as part of a workforce reduction."  See, Barnes v. GenCorp Inc., 896 F.2d 1457, 1469 (6th Cir. 1990); Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991).  "[T]he ADEA does not mandate that employers establish an interdepartmental transfer program during the course of a RIF; an employer incurs no duty to transfer an employee to another position when it reduces its workforce for economic reasons.  See, e.g., Earley v. Champion Int'l Corp., 907 F.2d 1077, 1083 (11th Cir. 1990); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1422 (9th Cir. 1990); Simpson v. Midland-Ross Corp., 823 F.2d 937, 942 n.6 (6th Cir. 1987)"; Taylor v. Canteen Corp., 69 F.3d 773, 780 (7th Cir. 1995).

production in California.  The Texas facility had been shutdown, and its inventory moved to California.  Callaway had indicated that within three months all golf club planning and procurement was to be done in California.  Against that backdrop, Lonczak was one of 41 office employees notified of layoff on April 15, 2004.

Lonczak, after being notified of his job elimination, understanding the document's meaning, signed a release of claims in exchange for severance payments.  The agreement signed by Lonczak expressly released Defendant "from all debts, liabilities or obligations to you whatsoever, whether known or unknown, which may now exist, including without limitation, any arising under any federal, state, or local law regarding employment discrimination or termination."  Although he received the promised severance payments, notwithstanding the signed release, Lonczak commenced this action.  Defendant submits that the Plaintiff's claim under M.G.L. c. 151B must be dismissed because Plaintiff entered into a binding agreement releasing such claims.

Further, the undisputed facts demonstrate that no genuine issue of material fact exists that would allow a reasonable factfinder to conclude that the Plaintiff was terminated due to his age.  Accordingly, the ADEA claim (and the M.G.L. c. 151B claim, if not precluded by the release) should be dismissed.

Lastly, even if the court refuses to dismiss the age claims, partial summary judgment should issue limiting Plaintiff's putative damages.  Thus, *inter alia*, partial summary judgment should enter precluding recovery of backpay for any period after Lonczak's alleged "replacement" ceased working for Defendant (and was not replaced).

## II.  The Release Bars All Claims Except Those Brought Under the ADEA

### A.   A Failure to Comply With OWBPA Does Not Negate the Release of Claims  Under M.G.L. c. 151B

The release signed by the Plaintiff, while generally compliant with the release provisions of the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f), did not, Defendant concedes, comply with the special provisions applicable to group waivers which are part of a group exit incentive plan.  Specifically, Plaintiff was provided with the standard 21 days to review the release (not the 45 applicable to group exit plans) and was not provided with information specifying the group covered and the job titles and ages of both eligible and ineligible individuals.  For this reason, and this reason alone, Plaintiff's ADEA claim is not barred by the release that he signed, and consideration that he received and retained.

However, it is clear that these special release provisions are not applicable when assessing the enforceability of a release of statutory claims other than those brought under the ADEA, which are the only claims governed by OWBPA.  Thus, a failure to comply with the specific requirements of OWBPA does not nullify the validity of a release of other employment related claims.  American Airlines, 133 F.3d 111 (1st Cir. 1998) (finding that failure to inform Complainant to seek counsel negated the release of the ADEA claims, but remanding the case to determine if there was an enforceable release of other employment related claims).  See, also, Rivera-Flores v. Bristol-Meyers Squibb Carribean, 112 F.3d 9 (1st Cir. 1997) ("Where Congress has wanted to insure particular protections for the employees in the procedures for obtaining releases, it has done so, for example, in the Older Workers Benefits Protection Act amendments to the

ADEA.  No such special procedures are set forth in the ADA.").  Congress did not make the OWBPA requirements applicable to state laws any more than it did to the ADA or Title VII.  There is, therefore, no basis for finding the OWBPA requirements, already found not applicable to claims under Title VII or the ADA, as a grounds for nullifying state law relating to release of state law claims, including M.G.L. c. 151B claims.

Indeed, our courts have recognized that agreements of employment disputes serve a salutary effect, allowing parties to resolve potential differences without the costs of litigation.  Dorn, et. al. v. Astra U.S.A. et. al., 975 F. Supp. 388 (D. Mass. 1997).  Thus, "[p]ublic policy strongly favors encouraging voluntary settlement of employment discrimination claims".  Equal Employment Opportunity Commission v. Astra USA, 94 F.3d 738, 744 (1st Cir. 1996).  Many, if not all, such agreements contain a release of claims aimed at avoiding litigation, and "[c]ourts have, in the employment law context, commonly upheld releases given in exchange for additional benefits.  Such releases provide a means of voluntary resolution of potential and actual legal disputes, and mete out a type of industrial justice."  Rivera-Flores v. Bristol-Meyers Squibb Carribean, 112 F.3d 9 (1st Cir. 1997).  Releases of statutory employment claims should be honored in all but the rarest of circumstances.  Melanson v. Browning-Ferris Industries, Inc., 281 F.3d 272 at 274 (1st Cir. 2002) ("… our precedent leaves little room for doubt that such a release, like a release of other federal statutorily-created rights, must be knowing and voluntary, as evidenced by the totality of the circumstances, and that, if it is, the terms of the release will ordinarily be given their legal effect.)  Rivera-Flores v. Bristol-Meyers Squibb Caribbean, 112 F.3d 9, 11 (1st Cir. 1997).

Given the benefits of encouraging such resolution, in non-ADEA cases, the determinative factor in deciding the issue is whether the execution of the release by Complainant was knowing and voluntary.  Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan, 167 F.3d 709 (1st Cir. 1999); Smart v. Gillette Company Long-Term Disability Plan, 70 F.3d 173 (1st Cir. 1995)

In determining whether there had been an effective release, courts look at the totality of the circumstances, looking generally, albeit not exclusively, at six factors specifically:  (1) the Complainant's education, business experience, and sophistication; (2) the parties' respective roles in deciding the final terms of the arrangement; (3) the agreement's clarity; (4) the amount of time available to the Complainant to study the agreement before acting on it; (5) whether the Complainant had independent advice-- such as the advice of counsel--when she signed the agreement; and (6) the nature of the consideration tendered in exchange for the waiver discussed in detail below.  Smart v. Gillette Company Long-Term Disability Plan, 70 F.3d 173 (1st Cir. 1995)".  "It is not necessary that each be satisfied before a release can be enforced.  The essential question is whether, in the totality of the circumstances, the individual's waiver of [his] right can be characterized as "knowing and voluntary."  Melanson v. Browning-Ferris, 281 F.3d at 276 (emphasis added).

The clear language of the agreement releases claims under "*federal, state, or local law regarding employment discrimination or termination*."  The written language, when clear and unambiguous is controlling, and extrinsic evidence will not be sufficient to create a dispute as to the effectiveness of a release.  "Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan, 167 F.3d 709.

9

Moreover, Plaintiff is a well-educated, sophisticated employee, who has acknowledged that he understood the terms of the document that he elected to sign. He had been given ample opportunity to review it, and see counsel of his choosing. There is no basis for finding that Plaintiff could not fully comprehend the clear import of the words, *i.e.,* that he was giving up any claims based on discrimination and his termination. Courts are appropriately unwilling to allow a claim that the competent employee did not understand its import and there is no basis for such a finding here. *Cf*. Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan, 167 F.3d at 715; Melanson v. Browning-Ferris, Inc., *supra* at 277.

The consideration tendered in exchange for the release was, quite clearly, sufficiently substantial. *See,* Melanson v. Browning-Ferris, Inc., *supra,* 281 F.3d at 278 (holding that $1,600 was sufficient to release sexual harassment claims). Nor is there any evidence that Plaintiff was coerced into signing the agreement, merely because he was facing unemployment and loss of income if he did not agree to the terms of the separation letter and release. Courts have been unwilling to allow a claim of financial hardship to negate the clear import of a release. *Cf.* Melanson v. Browning-Ferris, Inc., *supra,* 281 F.3d at 276 (no coercion although Plaintiff was "under financial stress and was a young, depressed, single mother.") Any employee losing his employment undoubtedly faces financial stress by the uncertainty ahead. But, "incapacity or duress [may not], without more, be inferred from merely the emotional and financial stress associated with loss of a job. To hold otherwise would be to make it virtually impossible for employers and employees to enter into binding settlements of employment disputes

occasioned by job losses, lay-offs and the like." Melanson v. Browning-Ferris, *supra* at 277.

Under Massachusetts state law, a release of employment claims in exchange for severance or other benefits will be enforced. White v. Commissioner of the Department of Employment and Training, 40 Mass. App. Ct. 249, 662 N.E.2d 1048 (1996) (Lump sum payment in return for release of any and all claims arising out of his employment constituted legal release of claims against employer); Smith v. Fallon Clinic, Inc., 1998 WL 296900 (Mass. Super., Toomey J.) (1998) (Plaintiff precluded from bringing suit against employer where she accepted offer of severance pay in return for general release of all claims against employer). The executed document precludes Lonczak from pursuing his claims under M.G.L. c. 151B.

B. Plaintiff Has Ratified The Agreement By Retaining the Consideration

Even assuming *arguendo* that the Agreement was signed under duress, or with insufficient time to consider whether to execute, a contract or release executed under economic duress is voidable, not void. In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989). *Accord*, Vasapolli v. Rostoff, 39 F.3d 27, 35 n.5 (1st Cir. 1994) ("A contract signed under duress is voidable, but not automatically void. By accepting the funds and failing to seek a remedy based on duress within a reasonable period of time . . ., the Complainants forfeited any entitlement to relief on this basis.") (citations omitted).[4] See, also, Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 24 (1st

_____

[4] Fleming v. United States Postal Service AMF O'Hare, 27 F.3d 259 (7th Cir. 1994) ("[T]he principle that a release can be rescinded only upon a tender of any consideration received is not a peculiarity of Illinois law; it is a general principle of contract law . . . and would surely be a component of any federal common law of releases.") See also, O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 (4th Cir.), *cert. denied*, 112 S. Ct. 177 (1991) ("It is

11

Cir. 1993), where the First Circuit succinctly stated:

> By accepting the benefits of their respective resignation agreements and by failing to notify Moore promptly that they intended to repudiate the agreements, Abbadessa and Mariotti treated the agreements as binding. After having done so, they now wish to treat the agreements as rescinded. That . . . they may not do.

The record shows that Lonczak accepted salary continuation consistent with the terms of his separation agreement and release.  He continues to retain the funds received as consideration for a release that, on its face, clearly precludes a lawsuit based on state discrimination laws.[5]  By doing so Lonczak ratified the agreement in two ways, "by intentionally accepting benefits under the contract" and "by remaining silent for a period of time after he has the opportunity to avoid it."  In Re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989).  Lonczak's failure to repudiate the agreement promptly precludes any claim of coercion.

Further, Plaintiff has never tendered back the consideration he received.  Failure to tender back the consideration received in exchange for his waiver of claims constitutes a ratification of the release.  In Re:  Boston Shipyard Corp., 886 F.2d 451,

---

a well-established proposition that retention of the benefits of a voidable contract may constitute ratification); Grillet v. Sears, Roebuck & Co., 927 F.2d 217 (5th Cir. 1991).

[5]Should the Plaintiff contend that the release is invalid in its entirety, Defendant urges the court to utilize the procedure followed by the district court in Kristoferson v. Otis Spunkmeyer, Inc., 965 F. Supp. 545 (S.D.N.Y. 1997).  In that case, the employee was retaining the benefits obtained in exchange for a release, while pursuing a Title VII claim.  The court ruled that henceforth "…before a Title VII plaintiff who has previously received benefits for signing a release from such liability can go forward with such an action, the plaintiff must execute a formal undertaking that requires the plaintiff, if the release is later found to be invalid, to return the consideration to the employer, in an amount (including possible interest) and on a schedule and other terms to be determined by the Court at the conclusion of the case, regardless of whether the plaintiff thereafter prevails on her Title VII."

455 (1st Cir. 1989).[6]  See, also, <u>Deren v. Digital Equipment Corp.</u>, 61 F.3d 1, 3 (1st Cir.

1995) (Barring ERISA and holding that whether or not the releases initially were

secured through duress, plaintiffs ratified them by their subsequent conduct.).

 To now require Defendant to defend a state law claim for discriminatory

termination, with its enhanced potential damages when such claim is clearly released by

the straightforward application of the agreement, would constitute unfair prejudice to

Defendant and have a chilling effect on such agreements in the future since employers

are not likely to want to provide employees with additional severance and benefit

packages only to have them accept the monies and later pursue a claim.  That would

undermine, rather than support, public policy.  <u>Carson v. American Brands</u>, 450 U.S. 79,

88 n.14, 101 S. Ct. 993, 998 n.14, 67 L. Ed. 2d 39 (1981).  The state law claim under

M.G.L. c. 151B is precluded by the executed release of claims, subsequently ratified.

## III.  No Reasonable Jury Could Conclude That Plaintiff Was Laid-Off Due To Age

### A.  Burden of Proof

 In ADEA discrimination lawsuits, plaintiffs bear the ultimate burden of proving

that their ages were the determinative factor in their discharge, "that is, that [they] would

not have been fired but for [their] age."  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841

(1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994).

To begin the process Plaintiff must establish a *prima facie* case.  Typically, in the

---

 [6]The Supreme Court's rejection of ratification of tender back of ADEA releases under
OWBPA, in <u>Oubre v. Entergy Operations, Inc.</u>, 522 U.S. 422, 75 FEP 1255 (1998), has no
effect.  That decision held that the Congressional mandated OWBPA, rather than common law
principles, covered releases under the ADEA, regardless of how her claim would be resolved
under common-law contract principles.  That decision does not, as shown by the cases cited,
affect the law regarding releases of claims under state law.

context of a reduction in force[7], to establish a *prima facie* case, the Plaintiff must demonstrate that:  (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered adverse job action; and (4) defendant did not treat age neutrally in the layoffs, or that a younger person was retained in the same position. Currier v. United Technologies Corp., 393 F.3d 246, 254 (1st Cir. 2004), Lewis v. City of Boston, 321 F.3d 207, 214 (1st Cir. 2003).  However, ultimately, the question to be determined when finding whether a *prima facie* case has been established depends on whether the evidence is sufficient to establish a "legally mandatory, rebuttable presumption" of discrimination.  O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311- 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996); Knight v. Avon Products, 438 Mass. 413, 780 N.E.2d 1255 (2003).  When assessing a *prima facie* case, "[t]he central question is whether the plaintiff has established a logical basis for a jury to find that the employer would not have taken the same action had the employee been of a younger age."  Id. at 426, 1265.

As discussed below, Defendant denies that the fourth element of the *prima facie* case has been satisfied.  Thus, the evidence shows that the layoffs *were* age neutral, and that Lonczak was not "replaced" with a younger employee.[8]  Ultimately however, whether a *prima facie* case has been met may be of small consequence.  Thus, establishing a *prima facie* case does not end the summary judgment assessment, it

---

[7]A workforce reduction occurs when business considerations cause an employer to eliminate one or more positions within the company."  LeBlanc v. Great American Insurance Co., 6 F.3d 836, 845 (1st Cir. 1993) (*quoting*, Barnes v. GenCorp Inc., 896 F.2d 1457, 1465 (6th Cir. 1990).

[8]In this context, the term "replacement "is used to describe a person retained in the position after the layoff, transferred into the position to assume new duties after the layoff, or hired to fill the position soon after the layoff.

14

merely requires that the employer articulate (and under M.G.L. c. 151B produce evidence of) a non-discriminatory reason for its decision.  In the case of a termination relating to a reduction in force, even if the employee has been "replaced" and can establish a *prima facie* case, the employer may justify a termination as non-discriminatory on the ground that it dismissed the employee because the other existing employees could adequately perform the plaintiff's work.  Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52, 59 (1st Cir. 2005).  Once "…the employer articulates a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, 'before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age.'  [cites omitted]  'Direct or indirect evidence of discriminatory intent may suffice, but "the evidence as a whole ... must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by age animus.'"  Connell v. Bank of Boston, 924 F.2d 1169, 1172 n.3 (1st Cir. 1991); see, LeBlanc, 6 F.3d at 836; Goldman, 985 F.2d at 1117; Rodriguez-Torres, 399 F.3d at 56-57; Sullivan v. Liberty Mutual Insurance Company, 444 Mass. 34, 54, 825 N.E.2d 522, 545 (SJC 2005).

While the court must view all the evidence in the light most favorable to the nonmoving party, to defeat a properly supported motion for summary judgment there must be evidence that would permit a rational factfinder to return a verdict in Plaintiff's favor "'without resorting to conclusory allegations, improbable inferences, and unsupported speculation,' Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990); Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 12 (1st Cir. 1998);

15

Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 129-130 (1997). See, also, Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (refusing, on motion for summary judgment, "to indulge rank speculation or unsupportable hyperbole"); Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 49, 674 N.E.2d 655 (1997)."

Where, as here, Defendant has produced evidence of a lawful reason for its actions, to avoid summary judgment the totality of the evidence must be sufficient to support a finding that there was actual discrimination. Zapata-Matos v. Reckitt & Colman, Inc., f/k/a L & F Products, 277 F.3d 40, 45 (1st Cir. 2002); Lipchitz v. Raytheon Company, 434 Mass. 493, 505, 751 N.E.2d 360 (2001) (in order for the alleged victim of discrimination to prevail, the factfinder must determine that the facts warrant a finding that "the employee has satisfied her ultimate burden of proving that the decision was made "*because of*" the unlawful discrimination. Weber v. Community Teamwork, Inc., 434 Mass. 761, 775, 752 N.E.2d 700 (2001); Lewis v. City of Boston, 321 F.3d 207 (1st Cir. 2003). The undisputed facts[9] here preclude a finding that Plaintiff was terminated due to his age.

### B. Penicka's Chamber of Commerce Comment Is Not Probative of A Claim that the Decision to Terminate Lonczak was Based on His Age

Plaintiff will presumably cite Penicka's comment at the Chicopee Chamber of Commerce, in June of 2004, to assert that there is a genuine dispute as to whether his *termination* was due to his age. The comment, by someone not involved in the selection of Lonczak for layoff does not suffice to establish a genuine dispute about a material issue of fact.

---

[9]In assessing the evidence, "minor quibbles are insufficient to create 'genuine issues of material fact' precluding summary judgment." Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 181-82 (1st Cir. 1989).

There is, of course, no dispute that a comment was made about the youth of the OCM, and at this stage the court must credit the version of the statement most supportive of Plaintiff's assertions.  Presumably[10], that is the recollection of Paul Duval, who asserted that Penicka said, "you all look up at the head table [where OCM members were seated], you'll notice a lot of young faces up here and that's not by accident, that's by design and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet."  (Facts ¶ 63)

While the court must credit Duval's assertions, by the same token the court does not have to disregard the context of Penicka's comments.  To the contrary, the court must assess the context when assessing if the comment would, either alone or taken together with other evidence, allow a reasonable factfinder to conclude that Lonczak, who was never a member of senior management, had been selected for termination by Tom Fry, several months earlier, due to Lonczak's age.  *See, e.g.,* Straughn v. Delta Airlines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (generalized "stray remarks" arguably probative of *bias* against a protected class, normally are not *probative of pretext* absent some discernable evidentiary basis for assessing their temporal and contextual relevance.")  Respectfully, even accepting Duval's version of the statement, this clearly isolated stray remark[11] cannot support a finding that the discharges of OCM members,

---

[10]In the Statement of Facts, all the variations of the comment are set forth, so the court can determine which is most beneficial to Plaintiff's assertions.

[11]There is no evidence of any other alleged ageist remark by Penicka.  Penicka himself was clearly upset, as he complained at the time, that his comments were taken out of context and were being perceived as ageist.

17

much less the discharges of non-OCM members including Lonczak, were based on age.

By all accounts, the Chamber comment related to the OCM team, not the office staff in general. Moreover, Penicka, who was not involved in the selection of Lonczak for layoff, was not discussing termination of the OCM members (much less the non-OCM members). Indeed, he was not addressing the termination process at all.

The statement itself was not made in the context of internal deliberations of who to layoff, or even in discussion about the reductions in force in general. Rather, the statement was made at a public meeting where, it is clear, Penicka was addressing a crowd of community business people (and TFGC employees brought to the meeting by TFGC as a show of support) with the undisputed goal of convincing an anxious business community that Defendant was in business in Chicopee "for the long haul". In that context, and amidst other discussion about TFGC and Callaway's intention to continue to support local charities and the local business community, a solitary mention of the youth of its new senior management team, "by design" is not probative of an intent to *terminate* older employees, in general, or Lonczak in particular. Indeed, an isolated comment regarding the purported youth of his OCM[12], uttered at what was essentially a pep-rally, cannot support a conclusion that Robert Penicka laid off any OCM member because of his or her age, or in order to allow him to hire younger

---

[12]Even with the new hires, the senior management team was not disproportionately young as compared to the general population or workforce. Rather, it was fairly representative, with three members between thirty-five and forty (Fry, Bosworth, and Kelleher), one in his sixties (Rist), two in their fifties (Arturi and Rousseau), and two in their forties (Penicka and Kennedy). It was only young, by design or otherwise, when compared to what people might stereotypically expect of OCM members. (Facts ¶ 63)

employees.  It certainly cannot support the conclusion that another person, a manager who was the decision maker in the decision to layoff Lonczak, decided to lay off Lonczak, a non-OCM employee, due to Lonczak's age.  McMillan v. M.S.P.C.A., 140 F.3d 288, 301 (1st Cir. 1998) (under state and federal law, "stray comments, particularly when they are ambiguous and uttered outside the decision-making process," do not support a finding of discrimination).  See, also, Young v. Dillon Companies, __F 3d. __, ___ , 2006 WL 3236297 (10th Cir. November 9, 2006) (to demonstrate intentional discrimination plaintiff must show connection between discriminatory comment and decision to terminate her.).

Obviously, the earlier April 2004 selection of Behaylo, Bettencourt, Lonczak and 38 others clearly could not have been affected by the subsequent comments made at the Chamber of Commerce breakfast itself.  While Penicka, as president, clearly was in a position to induce his subordinates to create a younger workforce by selecting older employees for layoff, not only is there is no evidence that Penicka ever encouraged them to do so,[13] Penicka's own actions belie any rationale inference that he did so.  Thus, following his appointment as president, Penicka had exercised his authority to reshape his own senior team, but had terminated only the two youngest, Louis Tursi, age 42, and Michael Esch, age 47.  On the other hand, Penicka retained on the OCM staff Vaughn Rist, age 62; Peter Arturi, age 50; Tom Kennedy, age 48; and Christine Rousseau, age 52.  The two youngest OCM members were terminated by Penicka, and replaced with former Callaway managers.  On the other hand, the four oldest OCM

---

[13]But see Arturi Affidavit ¶ 71.

19

members were retained.[14]  (Facts ¶ 63)

Moreover, the claim that there was ever such influence applied by Penicka to weed out older employees so that the company could get younger is definitively negated by the simple and undisputed fact that *the substantial layoffs that occurred simply have never resulted in the creation of a younger staff*.  The April 2004 layoffs resulted in the average age of the Chicopee office staff becoming slightly *older*.  (Facts ¶ 97)  Between the time TFGC was formed and the time it answered interrogatories in May of 2006, the percentage of office employees in the protected age bracket has *increased*.  Even after the elimination of hundreds of office positions, in 2006 one third (1/3) of the office workforce was over fifty years of age.  (Facts ¶ 97-99)

In assessing Penicka's ambiguous comment, the context shows that the prime reason for Defendant sponsoring the event, to which it brought several tables of employees, was not to announce a propensity to engage in age discrimination in reduction of force situations, but to allay fears in the Chicopee business community that its largest employer would not be around much longer.  Penicka, in attempting to allay those fears simply noted the youth of his own OCM staff, which in reality included both the oldest of the former OCM members and individuals newly *hired* by Penicka to fill vacancies that had either occurred due to a resignation or the termination of the two youngest OCM members.[15]  In the context they were made, and in light of the fact that

---

[14]Penicka also terminated two highly paid, but relatively youthful, marketing vice presidents, age 43 and 38.  (Facts ¶ 63)

[15]In another context, the statement would be relevant.  Thus, it arguably would justify a rationale inference that Penicka had a preference to *hire* relatively young OCM staff when there were vacancies on his senior staff, not that he was discharging OCM members due to their age. If this was a refusal to hire case brought by a fifty year old who had applied to the position on

20

there was no youth movement in the office staff as a consequence of the layoffs, there is no basis for finding that the public comment was an indication that either Penicka or anyone of his senior management team had, or was prepared to, discharge any individual based on age.

This court should not be swayed into disregarding the mountain of undisputed facts disproving the existence of age animus as a cause for the termination, in reliance upon a solitary remark taken out of context.  See, Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998); Blackwell v. Cole Taylor Bank, 152 F.3d 666, 671 (7th Cir. 1998); Richter v. Hook-SupeRx, Inc., 142 F.3d 1024, 1032 (7th Cir. 1998) (holding that employer's statements that employee had a "low energy level" and was "resistant to change" did not raise an inference of age discrimination); see, also, EEOC v. Clay Printing Co., 955 F.2d 936, 942 (4th Cir. 1992) (holding that statements referring to "young blood" are not probative of age discrimination or a discriminatory purpose); Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir. 1989) (holding that a supervisor's statement that he "needed younger blood" was insufficient to create a genuine issue of material fact regarding age discrimination); Nesbit v. Pepsico, Inc., 994 F.2d 703, 705 (9th Cir. 1994) (where the court affirmed summary judgment in an age discrimination case despite evidence of comments by supervisors such as "we don't necessarily like gray hair" and "we don't want unpromotable 50-year olds around".  See, also, Tenthoff v. McGraw-Hill, Inc., 808 F. Supp. 403, 407 (E.D.Pa. 1992) aff'd, 981 F.2d 1248 (3d Cir. 1992); Melnyk v. Adria Laboratories, a Div. of Erbamont Inc., 799 F. Supp. 301, 319 (W.D.N.Y., 1992)

---

the OCM staff, the statement might be probative.  It is not in a case relating to the *termination* of lower level office staff.

21

("Therefore, plaintiff's age discrimination claim is reduced to a reliance on one piece of direct evidence that Adria's decision to terminate her was motivated by her age:  a statement she heard Komenda make to a pharmacist that Adria was looking for a "young and energetic" sales representative to take control of its Syracuse territory. However, this isolated statement, which was not directed at plaintiff, does not satisfy plaintiff's burden.").

### C.  The Undisputed Facts Would Not Allow A Finding That Lonczak's Termination Was Due to His Age

"There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII even though those positions are held by members of protected groups (pregnant women included).  *See, e.g.*, LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 844-45 (1st Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994); Goldman v. First Nat'l Bank, 985 F.2d 1113, 1118-19 (1st Cir. 1993); [other citations omitted]  This is merely a reflection of a central theme that permeates the relevant jurisprudence:  insofar as Title VII is concerned, an employer can hire or fire one employee instead of another for any reason, fair or unfair, provided that the employer's choice is not driven by race, gender, pregnancy, or some other protected characteristic.  [citations omitted]; see, also, Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir. 1988) (elucidating similar proposition in ADEA case)."

Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 422 (1st Cir. 1996).  In the instant case, there simply are no facts that would allow the conclusion that the employer's decision to include Gary Lonczak amongst those being laid-off was driven by his age.

Thus, as noted, as a result of the numerous changes that have occurred, the employer's office staff has gotten *smaller*, and is now merely a shadow of its former size.  It has not, however, gotten *younger*.  That simple fact demonstrates

that the reduction in force in general was age neutral.[16]  Thus, the issue, *vis a vis* the existence of a *prima facie* case, becomes whether "younger employees remained in the same position".  If so, and given the employer's articulated reason, the court would then turn to whether there is a basis to find the employer's articulated explanations for what had occurred is a pretext, and that Lonczak was terminated because of his age.

Lonczak began to work for Spalding in 1998.  His job responsibility throughout his employment was materials manager for golf clubs.  Lonczak was a Category Logistics Manager when he was laid off in April 2004.  He was 51 years old and earning a salary of $81,000.  His primary responsibilities were planning and procurement for BEN HOGAN golf clubs, being assembled at Defendant's Ft. Worth, Texas facility, a facility that had been closed down by the time Tom Fry decided to layoff Lonczak.

The decision to terminate Lonczak was inextricably liked to a decision made by Callaway, not long after the TFGC was formed, to shut down the Ben Hogan golf club facility in Ft. Worth and move the assembly work to Carlsbad, starting a new production line that would be integrated with its production lines for CALLAWAY golf clubs.  The integration was to be completed by May of 2004.  Lonczak was made aware of these plans and in fact, played a role in the transition team responsible for closing the Texas facility he had previously supported.  (Lonczak Facts ¶¶ 122-126)

Part and parcel of the decision to transfer golf club assembly to Carlsbad was the decision that procurement and planning functions for the BEN HOGAN clubs, work that

---

[16]Of course, it would be Plaintiff's burden to show that the layoffs were not age neutral with statistically relevant demographic information.  See, <u>Shenker v. Lockheed Sanders, Inc.</u>, 919 F. Supp. 55, 59-60 (D. Mass. 1996).

served as the core of Lonczak's job responsibilities, would also be done by personnel working for Callaway in Carlsbad. (Lonczak Facts ¶ 107) Accordingly, in the spring of 2004, when Vice President of Manufacturing Tom Fry was reviewing his organization, as he had been directed to do, charged with the task of identifying the jobs that could be eliminated in light of the company's fiscal distress, he was of a mindset that all Ben Hogan planning and procurement would soon be wholly integrated in California. (Lonczak Facts ¶ 111) That belief, in essence, made it a relatively simple matter to determine that Lonczak's job could be eliminated.

There is no question that no younger person was retained in Lonczak's position, or assigned his job duties, at the time of his layoff. Thus, Lonczak cannot satisfy the fourth prong of the *prima facie* case. <u>Currier v. United Technologies Corp.</u>, 393 F.3d 246, 254 (1st Cir. 2004), <u>Lewis v. City of Boston</u>, 321 F.3d 207, 214 (1st Cir. 2003).

On the other hand, it is likewise undisputed that in the late summer or fall of 2004, Roseanne Turner was temporarily transferred from her relatively new position within the IT department, back to Manufacturing, during which time she did perform duties previously performed by Lonczak. Turner, a former colleague of Lonczak, was doing procurement and planning for products other than BEN HOGAN, before she was transferred to the IT department, a transfer that had occurred before the April layoffs.

Thus, Turner did not assume any portion of Lonczak's[17] duties until in the late summer or early fall of 2004. Moreover, by November of 2005, the integration was

---

[17] The planning function had, as originally planned, been successfully assumed by California based personnel and simply was not performed by Chicopee based employees following Lonczak's departure.

complete, and she returned to the IT position.  Neither she nor anyone else in Chicopee subsequently performed any work previously performed by Lonczak.

Defendant submits that the assumption of some of Lonczak's duties several months after the layoffs, is not sufficient to satisfy the fourth prong of the *prima facie* case.  Thus, assuming *arguendo* that Fry, in April, knew that he would need someone to perform some of Lonczak's duties commencing in the late summer or early fall, the fact remains that the company was losing millions of dollars.  There would be no business justification for continuing to employ Lonczak, at a cost of $6,750 per month, because he would later have something to do.

Of course the undisputed facts demonstrate that in April of 2004 Fry did not know that anyone would be needed to perform procurement services for the BEN HOGAN line.  No one knew that at the time.  Fry was acting, in good faith, based on the information available and Callaway's plans at the time, plans that called for the full integration of BEN HOGAN clubs in California within a few months of the layoff.  It was solely the decision by Callaway to restudy the QAD versus SAP computer system issue, a decision that did not involve Fry, that altered the original plans.  (Lonczak Facts ¶ 120)

Only after Lonczak's layoff was the decision made, *by Callaway,* to delay the integration.  Only because of that subsequent decision, by someone other than Fry, was Turner reassigned to oversee what remained of TFGC's BEN HOGAN responsibilities.  Turner's assumption of the transition in the fall of 2004, simply would not allow a jury to conclude that Fry's justification for including Lonczak among those being laid off in April "was not only a sham, but a sham intended to cover up the employer's real [and unlawful] motive" of discrimination."  Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246

25

(1st Cir. 2006) (citations omitted).  See, also, <u>Rivera-Aponte v. Rest. Metropol # 3, Inc.</u>, 338 F.3d 9, 11-12 (1st Cir. 2003) ("Whether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus.").

Obviously, as it evolved, Fry's belief that the duties would soon be permanently obsolete turned out to be incorrect.  However, the fact that events did not proceed as Fry had been informed they would does not assist Plaintiff's efforts to establish that the termination decision, in this context, was motivated by sinister animosity.  To assess lawfulness of the decision, the inquiry must focus on the mindset of the decision maker *at the time the disputed decision was made*, *i.e.,* spring of 2004.  When assessing pretext and the decision maker's good faith at the time, attention must be paid only to the information that Fry had at the time of the original decision.  Lonczak was responsible for BEN HOGAN, a brand that TFGC was no longer going to be responsible for.  Based on what he knew in April, it is clear there was no reason to retain Lonczak at a time the company needed to reduce its bloated staff.

Nor is Lonczak's case assisted by the fact that when Fry later learned that someone would have to continue to do procurement for BEN HOGAN longer than had been expected, he chose to utilize internal resources to temporarily cover the tasks rather than recall Lonczak, laid off months earlier.  A decision that existing employees could adequately perform the required duties, which still were only going to be for an limited period, is not evidence of discrimination.  <u>Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.</u>, 399 F.3d 52, 59 (1st Cir. 2005).  Thus, even if Turner's subsequent assumption of some of Lonczak's duties, following a change in plans by Callaway, is legally sufficient to establish a *prima facie* case, it does not prove that the articulated

26

reason for the action, the decision maker's conclusion as of April 2004 that Plaintiff's job was unnecessary, was discriminatory.

### IV.  Even If Summary Judgment is Denied, Partial Summary Judgment Limiting Damages Should be Granted

Assuming *arguendo* that the court denies the motion for summary judgment, partial summary judgment would still be appropriate regarding Plaintiff's claim for damages.  Thus, there is no question that Defendant has transferred its marketing, sales, financial, accounting and numerous other corporate support services previously done by salaried exempt employees in Chicopee to California.  Plaintiff's claim, at this point, boils down to an assertion that he should have been retained over someone else who has subsequently lost their job as part of the changes that have occurred.

In light of the radical metamorphosis of Chicopee to a mere manufacturing facility overseen by Carlsbad based personnel, it is clear that Lonczak's employment with TFGC would not have continued even if he was not laid off precisely when he was. There can be no basis, in such circumstances, to deny partial summary judgment relating to any claim for damages, in the fashion of either backpay or frontpay, beyond the point their alleged "replacement's" own employment ended, without the so-called replacement being replaced.  *See, e.g.,* Ramirez v. The Chase Manhattan Bank, 109 F. Supp. 2d 62, 65 (D.P.R. 2000) ("Ordinarily relief in discrimination suits will cease in the event that the plaintiff would have been the victim of a similar fate, *i.e.*, termination, due to subsequent business developments, *citing*, Blackburn v. Martin, 982 F.2d 125, 128-9 (4th Cir. 1992) ([T]he person discriminated against should only recover damages for the period of time he would have worked but for wrongful termination; he should not recover

27

damages for the time after which his employment would have ended for a nondiscriminatory reason.). Also citing, Bartek, 882 F.2d at 740 (backpay award ceased when position at issue eliminated); EEOC v. The Monarch Mach. Tool Co., 737 F.2d 1444, 1452 (backpay ends upon sale of business); Hill v. Spiegel, Inc., 708 F.2d 233, 238 (6th Cir. 1983) (period for calculating backpay for unlawful termination ended when facility closed), Richardson v. Restaurant Mktg. Assocs., Inc., 527 F. Supp. 690, 31 FEP 1562 (N.D. Cal. 1981) (Cutoff date for back pay period is date defendant ceased operations at facility at which plaintiffs worked, since neither plaintiff would ever have transferred to another of defendant's facilities.).  See, Helbling v. Unclaimed Salvage & Freight Co., 489 F. Supp. 956, 963 (E.D.Pa. 1980) (by implication) (closing of local branch at which plaintiff was employed terminated backpay period).  Thus, assuming arguendo that Plaintiff convinces the court that there is a material issue of fact as to whether his termination was premature, there is no question that his employment would have ended long ago, and that partial summary judgment is appropriate terminating potential economic damages at the time the "replacement" holding the position Plaintiff claims he would have been in absent age discrimination, permanently left the company without replacement.  Similarly, since the Defendant as a matter of law is entitled to reorganize and establish salaries and positions commensurate with its actual needs, backpay must be limited to the earnings of the alleged replacement, minus appropriate offsets.  Thus, even assuming that Roseanne Turner, who began to perform some of Lonczak's duties in the late summer or early fall of 2004, is deemed a "replacement", she ceased performing any duties performed by Lonczak by November 2005.  No one

28

else in Chicopee has since performed any duties Lonczak had performed.  There can

be no backpay for Lonczak  beyond that date.

Respectfully Submitted,


_____/s/ Jay M. Presser_____
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   November 30, 2006          Tel. (413) 737-4753/Fax: (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Defendant The Top-Flite Golf Company's Memorandum in Support of Its Motion for Summary Judgment* was served upon the attorney of record for each other party via electronic filing on November 30, 2006.

_____/s/ Jay M. Presser_____
Jay M. Presser, Esq.

29