*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

| | |
|---|---|
| GARY J. LONCZAK,<br><br>Plaintiff,<br><br>vs.<br><br>THE TOP-FLITE GOLF COMPANY,<br><br>Defendant. | CIVIL ACTION NO. 05-30180-KPN<br><br>**DEFENDANT'S LOCAL RULE 56(a) 1 STATEMENT** |

## I. Introduction

This Complaint arises out of the layoff of Plaintiff by The Top-Flite Golf Company

(hereinafter "TFGC", "Defendant" or "Company").  Plaintiff asserts that his termination

constituted age discrimination in violation of the Age Discrimination in Employment Act

and Chapter 151B.  The parties have engaged in extensive discovery[1].  Defendant has

---

[1] Four former employees of the Defendant, all represented by the same counsel, have filed parallel claims over their respective terminations in April and July 2004.  Discovery has, at least to some extent, become intertwined in the four cases.  Cumulatively fourteen depositions have been taken, each plaintiff and nine depositions taken by Plaintiff's counsel, including the deposition of each decision maker (Andrew Kelleher, James Bosworth, Tom Fry), the then Senior Vice President of Employee Relations, Vaughn Rist, and Robert Penicka, then Defendant's president.  Thus, Plaintiffs deposed five of the eight senior managers ("OCM") running Defendant at the critical period, four of whom were no longer with the Company at the time their depositions were taken.  References to deposition testimony will be cited by the deponent's name followed by the page number (*i.e.,* Penicka 22).  Deposition exhibits will be identified by deponent and exhibit number (*i.e.,* Rist Dep. Ex. ___).  In addition, Defendant has answered four sets of interrogatories, as well as supplemental interrogatories, and produced thousands of pages of documents in response to Document Requests by each Plaintiff, and a Supplemental Request for Production of Documents.  The Answers to Interrogatories have been attached to the supporting materials and are cited herein as Answer to First Set of Interrogatories No. ___.  Responses to documents, to the extent referred to herein, are attached to the materials in support of this motion, and will be described (*i.e.,* financial data produced in Response to Supplemental Document Request No. 3).  In addition, this statement will refer to an Affidavit from Peter Arturi, who has been a member of the senior management team, first of Spalding Sports Worldwide and later of Defendant, and all the permutations in between.

filed a Motion for Summary Judgment, and as required by D. Mass. L. Fed. R. 56.1,

Defendant submits this Statement of the Material Facts of Record as to which it

contends there is no genuine issue of fact.  The materials in support of these

statements of fact have been filed separately, as has the Memorandum of Law in

Support of the Motion for Summary Judgment.

## Undisputed Material Facts[2]

The Demise of Spalding Sports Worldwide

1. Plaintiff had been employed by Spalding Sports Worldwide, Inc. (hereinafter

   "Spalding") formerly a wholly-owned subsidiary of Spalding Holdings Corporation

   (hereinafter "SHC") headquartered in Chicopee, Massachusetts.  Spalding was

   involved in the production, distribution, marketing and sale of golf-related

   products (golf balls, golf clubs, golf shoes and golf gloves under the SPALDING,

   TOP-FLITE, BEN HOGAN and ETONIC brands), inflatable sporting goods

   (basketballs, footballs, soccer balls and volleyballs under the SPALDING brand),

   and softballs under the DUDLEY brand.  (Arturi ¶ 2)

2. "From 2001 through 2003, Spalding employed approximately one thousand

   individuals at its Chicopee headquarters.  Of these, approximately four hundred

   (including Plaintiff …) were salaried, non-union employees."  *Paren v. Craigie*,

   2006 WL 1766483 * 1.  It also employed many others at its wholly-owned foreign

---

References to his affidavit will be designated Arturi ¶ _____.

[2]For the convenience of the court, Defendant has organized the Statement of Material Facts so that that Facts ¶¶ 1-100 are common to all four cases, and the court's review of one will suffice and be applicable in all four cases.  Additional undisputed facts pertinent to this individual Plaintiff's claims commence with fact ¶ 101.

subsidiaries.  (Arturi ¶ 5)[3]

3.  At that time, the number of salaried, non-union employees included exempt

supervisors and managers that worked in the factory directly overseeing the

union factory employees involved in the manufacture of golf balls.  A far larger

number of those performed executive, managerial and administrative functions

relating to the marketing, sale and distribution of golf balls and other golf-related

products, as well as sporting goods, and a variety of other golf and sports related

business operations that were managed from Spalding's corporate headquarters

in Chicopee, including sales and marketing, finance, risk management, R&D, HR,

IT and legal functions.  (Arturi ¶ 6)

4.  Thus, in addition to manufacturing golf balls at its Chicopee facility, Spalding

operated a golf ball manufacturing facility in Gloversville, New York.  There were

a small number of on-site managers in Gloversville who reported to executives in

Chicopee.  Office employees working in Chicopee were responsible for

purchasing materials for the manufacturing process in Gloversville, for

accounting and financial functions relating to the balls produced in Gloversville,

and even most of its human resource functions.  Virtually all office support

functions for the Gloversville facility were, at the time, performed in Chicopee.

(Arturi ¶ 7)  Spalding also operated a golf club assembly facility in Gloversville,

assembling SPALDING and TOP-FLITE branded clubs, but which closed a few

---

[3]Defendant, at various points, quotes from language in an order of this court granting summary judgment in *Paren v. James Craigie and Daniel Frey*, 2006 WL 1766483 (D. Mass., June 15, 2006) as it relates to the time period prior to the creation of Defendant in September 2003).  To ensure compliance with Rule 56 requirements, these facts, established by the court in the materials submitted in that case, are corroborated in the affidavit of Peter Arturi.

years ago.  Like the golf ball facility (which is still in operation today), office employees in Chicopee supported the golf club assembly operation.  (Arturi ¶ 7)  Spalding also operated a facility in Richmond, Maine that produced ETONIC golf shoes.  Like the Gloversville and Ft. Worth operations, those overseeing the Richmond facility reported to managers in Chicopee.  Office employees working in Chicopee were responsible for procuring materials for and scheduling production at Richmond, and for accounting and financial functions relating to that facility.  While the Richmond facility was closed and all ETONIC golf shoe production moved to the far east in 1999, office employees working in Chicopee continued to procure ETONIC golf shoes for Spalding, were responsible for scheduling production of the shoes, for all accounting and financial functions, as well as all marketing and sales of ETONIC golf shoes.  (Arturi ¶ 10)

5. Spalding also operated a facility in Ft. Worth, Texas that assembled BEN HOGAN brand golf clubs.  Like the Gloversville operations, those overseeing the Ben Hogan facility reported to managers in Chicopee.  Office employees working in Chicopee were responsible for procuring materials for the assembly process being performed in Texas, for scheduling the assembly work to be done in Texas, and for accounting and financial functions relating to the assembly of BEN HOGAN brand golf clubs assembled in Ft. Worth.  Office employees working in Chicopee were likewise responsible for all marketing and sales of BEN HOGAN golf clubs.  (Arturi ¶ 9)

6. In addition, while with very limited exceptions Spalding had ceased manufacturing of anything other than golf balls in Chicopee, it had continued to

have a sporting goods division which, *inter alia,* procured and sold the SPALDING line of basketballs, footballs, soccer balls and volleyballs.  Using licensing agreements, Spalding would license unrelated third parties to produce and sell a variety of apparel and sporting goods with the SPALDING logo.  All support functions for the domestic sporting goods business (sometimes referred to as "inflatables") and the licensing business were performed by office personnel in Chicopee.  (Arturi ¶ 11, Rist Dep. p. 95)

7.  Spalding employees in Chicopee also managed an international department; which included wholly-owned subsidiaries in Canada (Spalding Canada), the United Kingdom (Spalding Sports UK), Sweden (Spalding Nordic), Italy (Spalding Europe), Japan (Spalding KK), Australia (Spalding Australia) and New Zealand (Spalding New Zealand).  The heads of these foreign subsidiaries reported to managers in Chicopee, who were responsible for overseeing the accounting and financial operations of the subsidiaries.  For those areas of the world not served by its foreign subsidiaries, Spalding had agreements with scores of distributors in smaller markets including Mexico, South America, South Africa, the Mideast, Russia, China, the Pacific Rim and elsewhere.  Managers in Chicopee oversaw the operations of these distributors as well.  (Arturi ¶ 12)

8.  In addition, in the mid-1980s Spalding had purchased Dudley Sports, which manufactured softballs and related equipment.  All executive and most office support functions for Dudley Sports were performed by office personnel based in Chicopee, Massachusetts.  (Rist 95-96)

9.  In 1996, Spalding had also purchased and operated the ETONIC golf shoe and glove business, and the ETONIC athletic shoe business.  All executive and most office support functions for the Etonic business were performed by personnel based in Chicopee, Massachusetts.  (Rist 96)

10. In 1997 Spalding purchased the assets of the Ben Hogan Company, which was known primarily for its line of BEN HOGAN brand golf clubs and accessories. (Arturi ¶ 8)

11. Spalding also operated a small outlet store selling its brand items at a facility attached to its Chicopee, Massachusetts facility.  (Arturi ¶ 14)

12. The Spalding golf and sporting goods businesses had been owned by various corporate entities prior to SHC's being acquired by Kohlberg Kravis Roberts & Co. (commonly referred to as "KKR") in 1996, a New York City-based private equity firm that focuses primarily on late stage leveraged buyouts.  (Arturi ¶ 15)

13. "In December of 1998, Spalding's majority owner, a firm called "KKR," recruited [James] Craigie to be Spalding's new president and chief executive officer ("CEO").  KKR had purchased Spalding in 1996, [through its purchase of SHC] but the company had continued to lose money.  KKR expected Craigie to lead a new team to turn the company around."  _Paren v. Craigie_, _supra_, *2.  (Arturi ¶ 16)

14. Craigie had been an executive with Kraft Foods.  "In 1999, Daniel Frey was recruited to become Spalding's chief financial officer ("CFO").  _Paren v. Craigie_, _supra_, at 2.  (Arturi ¶ 17, Rist 105)

15. Craigie, as part of his new team, also hired Michael Esch from Kraft to be the Executive Vice President of Operations overseeing the manufacturing process,

Louis Tursi, who had worked for Kraft before moving on to Vlassic Foods to serve as the Executive Vice President of Sales and Marketing, and Edward Several, also from Kraft, to serve as Vice President of Marketing Services. (Arturi ¶ 18, Rist 108)

16. Craigie, Esch, Tursi and Several, had no golf business related history, having worked in the food industry.  Some incumbent employees at Spalding derogatorily referred to the food industry executives as "cheeseheads", to denigrate their lack of golf related experience.  (Arturi ¶ 19, Rist 108)

17. "In any event, as president and CEO, Craigie presided over Spalding's operating committee (referred to … as "the OCM")."  The OCM, at one point, had eight members, all of whom were officers of the company, including Frey, Vaughn Rist ("Rist"), the [Senior Vice President of Employee Relations] and Peter Arturi ("Arturi"), the general counsel."  _Paren v. Craigie_, _supra_, at *2.  (Rist 8, Arturi ¶ 20)[4]  "Although Craigie and the OCM were ultimately accountable to the board of directors-which was controlled by Spalding's majority owner, KKR-the OCM, under Craigie's leadership, made the critical management decisions that directed the future of the company."  _Paren v. Craigie_, _supra_, at *2.  (Arturi ¶ 21).  At one point, there had been 12 OCM members.  In addition to those named in Paragraphs 18 and 19, they included Keith Keindel (who had been with Spalding Canada pre-Craigie and ran the International Division out of an office in Canada);

_____

[4]At its largest, the OCM had 12 members.  In addition to Craigie, Rist, Frey, and Arturi, OCM members included,Tursi, Several, Esch, Thomas Kennedy, Vice-President of Research and Development, Christine Rousseau (Vice-President and Chief Information Officer), Keith Keindel (head of the International division), Eddie Binder (head of marketing), Stephanie Lawrence (head of licensing).  Binder and Lawrence had left before the events in question here, and had not been replaced on the OCM.  (Arturi ¶ 20)

Eddie Binder (the head of marketing who had come from Dunkin Donuts), Stephanie Lawrence (head of licensing), and Several and Tursi.

18. "In 1999 and 2000, Spalding faced significant competitive challenges when Nike, TaylorMade, Adidas, and Callaway entered the golf ball market.  These challenges were compounded by the economic downturn following the events of September 11, 2001, increased competition from Titleist [a golf brand owned by Acushnet Company, then Spalding's largest competitor in the golf ball business], and the fact that golf, as a sport, was in a nationwide decline.  *Paren v. Craigie*, *supra*, at *2.  (Arturi ¶ 22)

19. Spalding was losing significant amounts of money on a continuing basis, and in each of five to seven years prior to July 2003, the company's financial condition worsened.  (Rist 96)

20. In addition to its operating losses, there was a large debt service relating to KKR's earlier purchase of Spalding.  KKR's purchase, costing nearly a billion dollars, had resulted in a combined senior and subordinated debt of nearly $850,000,000.  At OCM meetings it was articulated that the debt service was the principal impediment to Spalding's ability to achieve financial success.  (Arturi ¶ 23)  Indeed, as late as the fall of 2003 some OCM members were indicating that the debt service was the primary source of Spalding's financial woes.  (Kelleher 96)

21. In the Fall of 2001, Craigie recommended to the board of directors that Spalding be sold or, if a seller could not be located, that it undergo significant changes aimed at cutting costs so that it could survive as a stand-alone entity.  In order to

increase the company's desirability to potential buyers, the OCM discussed a variety of cost-cutting measures, including a possible one-third reduction of employees. *Paren v. Craigie*, *supra* at *3.  (Arturi ¶ 24)

22. In the Spring of 2002, Spalding entered into a restructuring agreement with Oaktree Capital Management.  The restructuring provided Spalding with additional time to try to forestall bankruptcy as its losses continued to mount. *Paren v. Craigie*, *supra* at *4.  (Arturi ¶ 25)

23. In May, 2003, continuing to suffer millions of dollars of losses annually, Spalding Sports Worldwide sold its sporting goods division, including the SPALDING line of basketballs, footballs, soccer balls and volleyballs, and the DUDLEY line of softballs, to Russell Corp.  Included with the sale was its historic SPALDING brandname.  (Rist 14, Arturi ¶ 26)

24. In a separate transaction in the same timeframe, the company sold its ETONIC golf shoe and glove business.  (Rist 14, Arturi ¶ 27)

25. As a result of these sales, the only portions of the business remaining by June of 2003 were those related to golf-ball manufacturing and sales, its TOP-FLITE golf club business (which involved the procurement of finished sets of clubs from China), and the BEN HOGAN golf club assembly business based in Texas. (Arturi ¶ 28)

26. Furthermore, having sold the SPALDING name, the business in Chicopee that formerly had been known as Spalding had to rename itself.  It chose to rename

itself after the golf-ball it manufactured, and became The Top-Flite Golf Company.[5]  (Arturi ¶ 29)

27.  The Spalding division of Russell Corp. (hereinafter Spalding/Russell) began to operate a business in Springfield, Massachusetts, under the direction of Scott Creelman, a former Spalding executive.  Some 25-40 Spalding employees voluntarily left to join the new business.  (Rist 102)

28.  Some office employees, working in an environment where the potential closing of the business appeared to be possible, if not likely, obtained alternative employment and were not replaced.  However, to a significant degree, the size of the office workforce remained unchanged notwithstanding the mounting losses and the divestiture of major business operations.  The OCM, in its discussions, recognized that with the sale a significant portion of its business lines, its employee complement of salaried office employees was disproportionately high compared to its actual needs, and contemplated adjusting the employee complement at the time.  However, the discussions at the OCM meetings reflected a realization that the remaining portion of the business would likely soon either be sold or have to file for bankruptcy.  Accordingly, even after the sale of much of its operations in the spring of 2003, the Spalding OCM ultimately decided to take no action to adjust its salaried workforce downward to reflect the

[5]When used in this Statement of Position and the accompanying Memorandum of Law, "TFGC" does _not_ refer to the entity that existed between the sale of the "SPALDING" name to Russell in the spring of 2003, and the creation of a new company, owned by Callaway Golf Company, after the asset purchase, through bankruptcy proceedings, in September 2003.  As described below, the new company, although legally distinct, ultimately also became known as The Top-Flite Golf Company, and it is this new entity that is referred to herein as TFGC.  As noted below, in communications with its employees, TFGC referred to the prior company as former Top-Flite/Spalding.

adjusted needs of a business that now solely involved the manufacture and sale of TOP-FLITE and BEN HOGAN golf balls, the procurement of TOP-FLITE golf clubs, and the assembly and sale of BEN HOGAN golf clubs.  (Arturi ¶ 30, Rist 104)

29.  Not long after selling off its sporting goods business, name, Etonic and Dudley businesses, on June 30, 2003, the former Top-Flite/Spalding entity filed a Voluntary Petition for Bankruptcy in the United States Bankruptcy Court for the District of Delaware, Case No. 03-12004-MFW.  (Arturi ¶ 31)

30.  The bankruptcy court ordered that what remained of the Top-Flite/Spalding assets be auctioned through the bankruptcy proceedings.  (Arturi ¶ 32)

31.  Callaway Golf Company (hereinafter "Callaway") is a public corporation based in Carlsbad, California, where it maintains manufacturing facilities, its headquarters, and its executive and office staff.  By 2003, Callaway had, for several years, been the number 1 rated golf club company for woods, irons, and putters.  (Arturi ¶ 33)  TaylorMade-adidas Golf ("TMaG") a competitor, sells TaylorMade equipment, adidas apparel and footwear, MAXFLI golf balls, and ROSSA putters.  (Arturi ¶ 34)  From the outset of the bankruptcy it appeared that Callaway and TMaG would be the most likely bidders.  (Arturi ¶ 35)

32.  The question of a significant reduction of force was raised again at an OCM meeting shortly after the bankruptcy filing.  The members of the OCM discussed a substantial downsizing; and even identified certain individuals that the Company might be able to do without, including specifically Paul Duval and many other individuals later terminated by TFGC.  (Arturi ¶ 36)  However, the OCM

once again decided not to take any action because it was, by then, clear that there would be an auction and the company's remaining assets were likely to be acquired by either Callaway or TMaG.  Based on preliminary conversations, it was believed that an acquisition by Callaway would result in the creation of a stand-alone operation.  On the other hand, it was believed also based on visits to the Chicopee facility by representatives of far east companies, that if TMaG were the successor bidder, its plan was to shut down the factory, move the manufacturing equipment to the far east, and manage the former business from its own California headquarters.  As a result the OCM decided to defer any reductions in force, concluding that if TMaG was the successful bidder at the auction, the issue would be moot as everyone would be laid off, and that if Callaway was the successful bidder at the auction, it would want to make its own decisions as to who to retain and who to let go.  (Arturi ¶ 37)  Indeed, Duval's name had been raised on several previous occasions as someone who might be laid off in a reduction in force, well before his eventual layoff.  However, he was competent and popular, and someone always found a reason not to eliminate his position; or if it was eliminated, he would be moved to a different position.  (Arturi ¶ 36)

33.  Andrew Kelleher, the subsequent CFO for TFGC, ultimately came to believe that the large number of people were retained because the finances at Spalding were such that they couldn't afford the severance costs attendant to a significant reduction in personnel.  (Kelleher 109)

34. When TFGC came into existence in mid-September 2003, the Company employed 367 office employees, all former Top-Flite/Spalding employees, in its Chicopee executive suites and offices. (Arturi ¶ 38)

35. Daniel Frey was not among them, as he accepted a position with St. Paul Traveler's on or about June 20, 2003 and voluntarily left Top-Flite/Spalding's employ. _Paren v. Craigie_, *supra* at *5. (Arturi ¶ 39)

36. After achieving success as a golf club manufacturer, Callaway had also begun to manufacture golf balls, at one point through a wholly owned subsidiary named Callaway Golf Ball Company. That initially independent company had been dissolved and "folded into" Callaway. The golf ball manufacturing process for Callaway had been directed by a man named Robert Penicka. (Penicka 10)

37. Penicka had obtained a Chemical Engineering Degree from Ohio State University in 1984. He had worked for General Electric for eight years, starting as a supervisor and working his way into management, and later as Vice President of Manufacturing for Harmon International Industries, and then by Odyssey Golf Company. He was working for Odyssey Golf Company when it was purchased by Callaway in 1997. He became the Vice-President of Manufacturing Technology for Callaway in Carlsbad and later the Senior Vice President of Manufacturing for Golf Ball Manufacturing, and then Senior Executive Vice President of all manufacturing for all of Callaway. He was an executive with Callaway since 2001. (Penicka 6-10) He was 41 years of age in September of 2003. (Arturi ¶ 45)

### A New Company Is Formed and Then Integrated Into Callaway, Major Entrepreneurial Decisions Are Made

38. Ultimately, in September 2003, some of the assets of the bankrupt Top-Flite/Spalding entity were purchased, through the court ordered bankruptcy auction, by an entity then called TFGC Acquisition Corp., a newly formed, wholly owned subsidiary of Callaway, separate and distinct from the former Top-Flite/Spalding entity that had filed for bankruptcy. Desirous of retaining the marketing advantages of the TOP-FLITE brand, the new company changed its name and designated itself "The Top-Flite Golf Company, a wholly owned subsidiary of Callaway Golf Company" (hereinafter "TFGC"). The former Top-Flite/Spalding entity also changed its name and became TFGC Estate, Inc. which remained in existence for a period of time to close the affairs of the bankrupt business, including, to the extent feasible, paying off the pre-bankruptcy debts of the Top-Flite/Spalding entity and the liabilities incurred while it had operated in bankruptcy for 2½ months, liabilities not assumed by Callaway as part of its auction bid. (Arturi ¶ 40; Rist 98-99)

39. At the time of the bankruptcy asset acquisition, Callaway's Chairman was Ronald Drapeau. At the time, and for several months after, it was Drapeau's articulated intention to leave TFGC as a stand-alone company, with full responsibility to design, market, procure its own products under the TOP-FLITE and BEN-HOGAN lines, separate and distinct from Callaway. (Penicka 25-26, Rist 29, Bosworth 147)

40. On or about September 15, 2003 office employees of the former company, including Plaintiff, received a letter offering "*new employment*" with the newly created Company. If they accepted, the new employees were required to complete new "Employee Invention and Confidentiality Agreements", they were required to sign documentation indicating that they were aware of the new company's Sexual Harassment Policy, and to sign a new Callaway Golf Information Security Policy and Agreement. (Arturi ¶ 41, Duval Dep. Ex. 12, Behaylo Dep. Ex. 3, Bettencourt Dep. Ex. 12, and Lonczak Dep. Ex. 1)

41. Distinguishing itself from its bankrupt predecessor the offer letter expressly advised the putative new employees that:

> "Because Spalding/Former Top-Flite is still in bankruptcy, it is important that we all work together to make sure that all claims and liabilities that belongs to the old company stay there, and that we start our new company with a clean slate." Employees of the new company were advised that all pending health care claims, and other matters relating to their prior employment, should be directed to Human Resources "as soon as possible so that they can be forwarded to Spalding/Former Top-Flite before it liquidates and ceases to exist."

> Id.

42. The new Company carried over the seniority, title and compensation rates and some benefits that employees had with former Top-Flite/Spalding but not the former pension, retiree medical, and retiree life insurance coverage that had existed, all of which had been terminated as a result of the bankruptcy and asset purchase. Id.

43. TFGC did not accept the existing collective bargaining agreement in place between former Top-Flite/Spalding and the union representing the factory employees, but rather, negotiated a new collective bargaining agreement which

differed in material ways, did not continue the prior company's pension plan, retiree medical insurance and other benefits.  (Rist 116, Arturi ¶ 42)

44.  The creation of TFGC did not bring an end to changes for the entity formerly known as Spalding, or the employees.  To the contrary, several major entrepreneurial changes affecting both Callaway and TFGC, including its Ben Hogan operations, have occurred since September 2003, as the companies attempted to stem a continuing tide of financial losses.  These changes included a decision by Callaway, in the winter of 2003, to close the Ben Hogan Ft. Worth, Texas operation, and consolidate all its golf club manufacturing and assembly operations in Carlsbad, under the direction and supervision of Carlsbad-based Callaway employees.  As a result, in the spring of 2004, the Texas facility was closed and all BEN HOGAN golf club assembly work was moved to Carlsbad, California.  Procurement for the TOP-FLITE golf club business had already been transitioned to Carlsbad.  (Arturi ¶ 43)

45.  In approximately the same time-frame, there was a decision to close Callaway's golf ball manufacturing operations in California and transfer the manufacturing of CALLAWAY golf balls, a "higher end" ball than the TOP-FLITE brand, from California to Chicopee, Massachusetts.  (Arturi ¶ 44)

46.  Other entrepreneurial changes were more gradual, the result of abandonment of the original plan to have TFGC operate as a stand-alone company, with Robert Penicka as its Chicopee-based president.  At the time TFGC was created, Penicka was asked by Drapeau, then Callaway's CEO, to relocate with his

family, from California to Chicopee to become the President of TFGC.  (Penicka
19, Arturi ¶ 45)

47.  The initial plan was revised, however, to the point that ultimately, Chicopee
became merely a manufacturing entity with virtually all executive and
administrative functions for what was the TFGC business and the Ben Hogan
business, formerly performed in Chicopee, now being performed by Callaway
personnel in Carlsbad.  (Penicka 20)

48.  This major change from TFGC remaining a stand-alone business, was the result
of two significant factors subsequent to the creation of the new Company, that
were unforeseen in September 2003.  First, as a stand alone company, TFGC
continued to lose millions of dollars.  (Kelleher 139)  Secondly, Drapeau, the
Callaway CEO, was himself removed from his position in August 2004.  His
successor did not share Drapeau's beliefs about the desirability of an
independent TFGC.  (Penicka 25-26)  Several years earlier Callaway had
purchased Odyssey Golf, and after a period of independence, had consolidated
Odyssey's operations into Callaway's.  For some, Drapeau's removal as CEO of
Callaway was a forewarning of the potential changes to come for TFGC.
(Bosworth 62, 102)

49.  Indeed, when Drapeau was removed as Chairman and replaced by William
Baker in the summer of 2004, the new chairman asked Penicka to return to
California, oversee Callaway's manufacturing operations, and oversee TFGC
from California.  (Penicka 76-77)  As detailed below, the consolidation of the

companies has subsequently affected virtually the entire OCM and most of the employees working for TFGC.

50. New managers brought into run the Company brought with them new ideas. Thus, in the summer of August 2004, TFGC's new Vice-President of Sales, hired shortly in April 2004, decided to cease using employee salespersons to sell product. Rather, by the end of the year, all TFGC field sales personnel wishing to continue selling TFGC products would become bona fide, contractual, independent contractors rather than employees. Each would be eligible for a more lucrative commission package, designed to attract and retain better quality sales personnel, and would be provided with the ability to sell products by other companies as well as those sold by TFGC. Those unwilling to sell on behalf of TFGC as independent contractors rather than employees, were terminated at year end. (Bosworth 35-40)

51. Even though TFGC remains a separate legal entity, it has ultimately become a mere division of Callaway rather than, as Drapeau had originally intended, a distinct stand-alone business. (Arturi ¶ 46) Furthermore, by June 2005, the decision was made by Callaway, and contrary to the desires of the TFGC Vice President of Sales, to merge the TFGC sales and marketing operations, as well as its accounting and financial operations. The sales personnel would report to individuals in Carlsbad, and would sell Callaway products as well as TFGC products as employees of Callaway. Finance functions previously performed in Chicopee would likewise be moved to Carlsbad. Chicopee became simply a manufacturing facility, with virtually all managerial and administrative functions

being performed by personnel working for Callaway in Carlsbad.  (Kelleher 98-102, Arturi ¶ 47)

52. The Research and Development function remained in Chicopee after the departure of sales and finance functions, but presently those functions are also being transferred to Carlsbad, and R&D engineers and scientists in Chicopee are being laid off.  In many ways Chicopee became to Callaway what the Gloversville facility had always been to Spalding, solely a manufacturing facility with a few supervisors and lower level support staff, but with virtually all managerial and administrative functions controlled by personnel working in Chicopee.  (Arturi ¶ 48)

**Managerial Changes Under the New Company**

53. Callaway made few immediate managerial changes immediately after the bankruptcy asset purchase.  The exception was the naming of Robert Penicka as president; taking over for James Craigie who was never employed by TFGC. Penicka and his family relocated to Chicopee from Carlsbad, California, and Penicka assumed the presidency in September 2003.  There were no other immediate changes in the OCM members made at that time.  (Penicka 19-20)

54. Between September 2003 and the following June, when Penicka introduced his own new management team to attendees at a Chicopee Chamber of Commerce breakfast, Penicka had made two changes, replacing two OCM members who had been part of the "new team" that Craigie had brought in after he had been recruited by KKR.  Penicka had also filled the vacancy left by the voluntary departure of Daniel Frey the prior June.  (See Facts below)

55. Andrew Kelleher (age 38)[6] is a Certified Management Accountant with an MBA. He had worked as a Vice-President and Controller for Babcock Borsig Machinery before seeing an advertisement and applying for a position with TFGC in December 2003. He was recruited by Vaughn Rist, interviewed with Penicka and other OCM members, and was hired as Vice President of Finance. At the time he was hired, he was informed that the Company had incurred significant losses in the past and that it did not "have control" over its cost. (Kelleher 6-10, 15, Rist 38) Kelleher, who became Vice President of Finance and Administration in 2004, left the employ of the Company, looking for a better opportunity, in July 2006, after all the financial functions in Chicopee had been transferred to California. (Kelleher 6)

56. Also in December 2003, Penicka, dissatisfied with his performance, decided to terminate Michael Esch (age 47). Like Frey and Tursi, Esch had been brought into Spalding by Craigie. Penicka decided to replace Esch with Tom Fry. (Penicka 29, 39-40, Kelleher 144)

57. Fry (age 35) has a BS from the USAF Academy and a Masters of Science from the University of Southern California. After an honorable discharge from the Air Force, Fry commenced employment at Callaway Golf as a production manager in the golf ball division. He then worked as a Six Sigma Black Belt, a problem solving discipline, then as the Director of Golf Club manufacturing for Callaway.

---

[6]Consistent with the court's guidelines, aimed at protecting individuals' identities in the age of electronic filing, only the age of an individual and not his date of birth will be provided. Defendant does not believe that more precise information is important in this case, but will be willing to provide specific dates, under seal, if the court believes that the precise birth date would be helpful.

He came to Chicopee as the Senior Director of Operations (where he was promoted to Vice-President in June 2004).  (Fry 6-10)  Fry had reported to Penicka when both worked for Callaway.  (Penicka 40)  Fry was also the son-in-law of the then Chairman of the Company, Ron Drapeau.  (Fry 33)

58. Penicka also decided, in the spring of 2004, to terminate Louis Tursi (age 43) the Executive Vice President of Sales and Marketing, and a member of the OCM.  At the same time Penicka terminated two of Tursi's direct reports, Edward Several, (age 43) Vice President of Marketing Services & Customer Service, and Timothy Seitter, Vice President of Marketing (age 38).  Motivating Penicka's decision was the fact that the sales had continued to slip, as did the Company's profitability, despite spending what Penicka considered a lot of money for marketing and promotion.  (Penicka 49-50)  The combined salaries of the three vice-presidents brought in by Craigie and/or Tursi, and terminated by Penicka in April 2004, exceeded ¾ of a million dollars.  (Arturi ¶ 49)

59. Further, Penicka believed that these individuals, a number of whom who had come in from Kraft where Craigie had been, were unfamiliar with how to successfully sell in the golf market, applying techniques that were better suited to the packaged and consumer goods industries.  (Penicka 49-50, Kelleher 127-130, Bosworth 140)  Penicka wanted to bring in people that had specific golf experience and knew the products, knew the trade, and had the customer contacts that he believed were critical to turning around the company.  (Penicka 32-33)  Penicka's view of the differences in the approach to selling golf balls was shared by others.  Thus, in the fall of 2003, Penicka had Jamie Bosworth, an

experienced golf sales executive, meet with Tursi to explore the possibility of Bosworth joining TFGC and working with Tursi, to bring his golf experience to the Company, working with people whose experience had been with packaging. After meeting with Tursi, Bosworth told Penicka that he had no interest in working with Tursi, whose approach to sales Bosworth viewed as unworkable in the golf industry.  Bosworth viewed Tursi as very smart, but believed that Tursi was utilizing a sales approach that was fine for a dominant force like Kraft Foods, but unacceptable in the golf business which "is more Mom and Pop", entities that "don't like being dictated to, especially when you don't have a dominant brand. They won't bring it in and they also don't take to outsiders very well at all." (Bosworth 140-144)

60.  To replace the terminated Tursi, Penicka again turned to a former colleague he knew from his days with Callaway, Jamie Bosworth.  (Penicka 33-34, Bosworth 138)  Bosworth was well known in the industry.  (Rist 39)  Indeed, soon after coming to Chicopee, Penicka had some preliminary discussions with Bosworth. Penicka had told Bosworth that while he had a lot of people with excellent food and packaged goods experience, he needed more golf experience, specifically to understand the marketplace.  (Bosworth 11-14)

61.  Bosworth had originally worked as a golf professional at Pebble Beach Golf Links.  He then went to work at Odyssey Golf and rose to the level of Brand Manager and National Sales Manager for that company.  When Callaway purchased Odyssey Golf, he was hired by Callaway.  He then worked for Callaway for four years as a Key Account Manager, taking care of the largest

customers in the New York metropolitan area.  He then was hired as the

Northeast Sales Manager for Cleveland Golf Company, for whom he was

working in the spring of 2004, when he was again approached by Penicka,

seeking to hire him for a still struggling TFGC.  (Bosworth 8-11)

62. Bosworth was contacted by Penicka on April 9, 2004, told that Penicka was

going to make a change, and asked if he was interested in the position.  The

parties quickly negotiated terms, and by the end of the next week Bosworth had

accepted a contract and commenced employment as the Vice-President of

Sales.  (Bosworth 14-17)  Within a few months, his position was Vice-President

of Sales and Marketing.  (Bosworth 7-8)  Bosworth remained with TFGC only

through June of 2005, at which time he himself was terminated when Callaway

decided to consolidate the TFGC sales force with its own, based in Carlsbad.

(Bosworth 8, 150)

63. By the time Penicka spoke at a meeting of the Chicopee Chamber of Commerce

in June 2004, of the six members of the senior management or OCM staff he had

inherited when he assumed the presidency, Penicka had removed only the two

youngest, Tursi, age 42 and Esch, age 47.  He had replaced these individuals,

who had had little tenure with the Company, both having been recruited by

Craigie after his own arrival in December of 1998.  Neither Tursi nor Esch had

golf business experience.  Both had been replaced with two colleagues of

Penicka who had worked with him at Callaway, *i.e.*, Tom Fry and Bosworth.  He

had also filled the vacant CFO position, previously held by Dan Frey, by hiring

Kelleher.  (Arturi ¶ 50)  On the other hand, Penicka retained on the OCM staff all

*-23-*

the OCM members who had predated Craigie's arrival at Spalding.  The OCM members not terminated from the OCM were Vaughn Rist, Vice-President of Human Resources, age 62; Peter Arturi, age 50, General Counsel; Tom Kennedy, age 48, Vice-President of Research and Development; and Christine Rousseau, age 52, Vice-President of Information Technologies.  (Arturi ¶ 51, Rist 25)[7].

### Penicka Addresses the Chicopee Chamber of Commerce

64.  Vaughn Rist, Vice President of Human Resources had, on behalf of his employer, been attending Chicopee Chamber of Commerce meetings for many years.  In 2004, it was Rist's perception that there was local concern for the future of TFGC, that "a lot of townsfolk felt it was getting a little stale and a little old and they were very concerned about Callaway taking the whole company, bottling it up and move it out of here."  He arranged for TFGC to host a breakfast meeting of the Chamber, with the intention, according to Rist, of bringing a level of confidence to the community that the organization had a new life to it and it was committed to stay here in Chicopee.  Rist was to serve as Master of Ceremonies and introduce the new President, Penicka, who in turn would introduce those at the head table (the OCM) and make a brief presentation as to what was happening at the company.  (Rist 70-74, 79-81)

65.  Meeting with Penicka in advance of the Chamber breakfast meeting, Rist stressed that Penicka should focus on letting the attendees, and through them the town, know (1) that TFGC was an ongoing business that was "here to stay"

---

[7]As noted above, Penicka had also terminated two highly paid Marketing Vice Presidents, age 43 and 38.

and "very happy to be here in Chicopee", and (2) convincing the attendees that there was an energy and a new way of approaching things at the Company, and a new feeling amongst the Company. Rist told Penicka that basically they wanted to give a little background of Callaway, explain what they were going to try to accomplish, and allay concerns that the Company was not going to remain in Chicopee. (Rist 70-74, 79-81)

66. At the Chamber breakfast meeting, the Company, in addition to having Penicka and most of the OCM members present and seated at the dais, also had purchased two tables worth of reservations and invited TFGC personnel from the sales and marketing department to attend, set up displays about the Company and its products, and give away free merchandise to attendees. Id. (Rist 70-74, 79-81)

67. During the course of the meeting, Penicka commented that he knew TFGC had been a good citizen of the community, done some charitable work, and would continue to do that. He gave an overall business update and talked about the fact that yes, the Company was bought out of bankruptcy and losing millions of dollars and was continuing to lose money, but he was going to try to aggressively turn that around. He then proceeded to introduce his OCM team which was seated at the head table. (Penicka 72-73)

68. In a "meet and greet" before the formal breakfast meeting had begun, several attendees had expressly commented to Penicka that his senior staff appeared very young. (Penicka 73-74)

69. Witnesses vary somewhat regarding exactly what was said by Penicka when introducing his senior staff.  For his part, Penicka recalls stating that "I did make reference to that during my talk -- that as some of you pointed out, yes, some of these people are younger than you might expect them to be in the roles they're in but they are all experts in their field, good at what they do and we will try hard to turn the business around."  (Penicka 73)  Paul Duval, who attended, recalls Penicka referring to the senior management team at the head table stating, "you all look up at the head table, you'll notice a lot of young faces up here and that's not by accident, that's by design and in some cases, the people that are in the jobs they're in may not even be qualified to be in them yet."  (Duval 192[8])

---

[8]Defendant is aware that the Court must accept the version of the facts most favorable to Plaintiff.  Numerous witnesses were asked about their recollections, and while they all remember that Penicka's comments were specifically referring to the senior management (OCM) team at the dais, their accounts differ somewhat.  For thoroughness, and so the court can determine the version that is most advantageous to Plaintiff's claims, each version is presented below.

James Bosworth, Jr.:  "He said he was going with a group of young managers with -- who might not have a lot of years in age but have a lot of years in experience in the golf business and that they should be excited about the new team that's there and the fact that we were moving our families and making a commitment to the company."  (Bosworth 116)

Christine Conti: "He got up and introduced all of the people behind him and he said something to the effect that if you notice I have a very young group of men behind me and that is not by accident, it's by design.  They have a lot of experience between them and we're going to be going for fresh innovative and quick kind of a deal.  See now I could be mixing up things that I've heard in person and things that I heard there.  At the time it was going -- I remember him saying stuff about innovation and I certainly didn't know we were going away so I'm thinking he said things about Callaway working with the community and stuff like that but I have attended an awful lot of these…. I think he kind of collectively talked about them all.  He said something about even though they were young, he had X amount of experience between themselves because of the people that they had been tutored under, something like that.  (Conti 59-60)

Darlene Orciuch: "I remember him referring to the rest of the people up at the table and talking about the new changes at Top-Flite and saying that the faces up here are young.  You probably recognize that but they're young but that's by design.  They're young and hungry.  (Orciuch 16) "Well, I do remember him also bringing up the fact that the factory had signed a five-year agreement, the union contract." …" Just the fact that we'll be keeping jobs in the area and the golf balls would be manufactured here and we've got a good plant and equipment and investing in the company with the equipment and manufacturing."  She believed he individually introduced

70.  When an elderly attendee asked what that meant for older workers at the

Company, the MC, Vaughn Rist, quipped that he was the old gray haired guy and

he was still there, "and everyone chuckled".  (Conti 64, Rist 81[9])

71.  Later, upon hearing that his remarks had been perceived by some as ageist,

Penicka told Bosworth, "Well, I didn't mean it in the way in which obviously --

because I just wanted people to be comfortable with the fact that you guys all

look very young.  It's very obvious you look young and I wanted to alleviate their

potential concerns that you guys were too young for the job."  (Bosworth 117)  He

---

each member of the senior staff.  "The faces that you see up here are young and that's by
design.  They're young and hungry."  "He went into the history -- some of the history and the
manufacturing and stuff.  I believe that came afterwards but I'm not sure if that was before that
or not."  (Orciuch 43-46)
Andrew Kelleher:  Penicka was basically introducing his senior staff to the business community.
I believe an individual asked if Penicka was only interested in hiring young people, something to
that effect.  Penicka replied absolutely not, that provided they could do the job he'd hire anyone.
(Kelleher 69)
Cynthia Nunes: " …well, he was saying where the company was going, what we were heading
for and then he was saying about the new products and then me mentioned about -- which
totally shocked me that he actually said this -- that by design, you can tell by the people -- it's
not a quote, I'm not quoting; this is my own version -- about the younger people coming in and
that's by design, that they're bringing younger employees in.  "Q.  Do you remember him making
any comment about their abilities or their being good or aggressive or that they are committed to
the company?]  I want to say that he did say the aggressiveness but I'm not sure about the
commitments and so forth.  By being younger, I think.  That's the interpretation I took.
Vaughn Rist:  I said basically what we were going to try to accomplish was exactly that, address
the issues of we're here to stay, Callaway is a good company, give a little background of
Callaway and how employee-oriented they are and things of that nature.  Q: What did Mr.
Penicka say as far as you can recall?  A: Pretty much that.  He made a quick comment -- and I
don't recall exactly what the comment was but there was a quick comment about something like
that [the youth of his staff].  (Rist 74-80)
Thomas Fry:  I remember that Mr. Penicka spoke.  I remember that they served breakfast and
that's about all I remember about the meeting.  Q:  Do you remember anything Mr. Penicka
said?  A: No.

    [9]Cynthia Nunes recalls Penicka responding that they still had Vaughn Rist and look at all his
white hair.  (Nunes 57)

told Kelleher that his comments which were supposed to be introducing his new energetic senior staff had been taken out of context.  (Kelleher 71)

72. In any event, Penicka was not involved in the selection of Plaintiff for layoff. (Penicka 35, 52-57, Fry 25, Bosworth 74, Kelleher 18, 21, 30-34)

### Changes Affect Employment Across the U.S.

73. The integration of TFGC and its BEN HOGAN products into Callaway affected employment from coast to coast and some places in between.  In some instances, employment at a particular location increased, in other cases it decreased, and in one instance it disappeared entirely.  Plaintiff was one of hundreds of office employees initially hired by TFGC who have lost their position. In total, between its creation in September 2003, and May 2006 when it answered interrogatories in this matter, a total of seven hundred eighty-five (785) TFGC employees were laid off, terminated or resigned.  (Resignations are included because separations were coded as a resignation even when employees had been given notice that they would be laid off, and thereafter resigned (presumably as a result of finding alternative employment) before they were actually laid off.)  Furthermore, others presumably resigned because they recognized that they were likely to be laid off and were actively searching for alternative positions.  (See Answers to Interrogatories, pp. 5-21, Arturi ¶ 51)

74. Refining it to office employees, at the time the new company was created in September 2003, there were 367 office employees of TFGC in Chicopee.  (Arturi ¶ 53)  There are now fewer than 100 exempt salaried employees working for TFGC in Chicopee, virtually all involved in direct manufacturing or research and

development ("R&D").  (Kelleher 133, Arturi ¶ 53)  The R&D function, like sales, finance and other functions earlier, is presently being transferred to Carlsbad. Most of the R&D engineers and scientists presently working, who are exempt salaried employees, have either been laid off or notified that they will be laid off by December 31, 2006, with several more being informed that they will be laid off in April 2007, as the number of salaried exempt employees in Chicopee will continue to shrink.  (Arturi ¶ 54)

75.  Of the eight OCM members at the time of the Chamber meeting, at the present time the only one continuing to work full-time in Chicopee is Fry.  Kennedy, while still a full-time employee, works off-site as an inventor, since he no longer has any employees to manage.  (Arturi ¶ 55)  Rist retired and was not replaced. (Penicka 61)  When the sales function was transferred to California in June 2005, Bosworth was terminated and not replaced.  (Bosworth 8, Penicka 61)  Kelleher resigned and was not replaced, after the financial functions were transferred to California.  (Kelleher 6, Arturi ¶ 56)  Rousseau moved to California to work for Callaway and was not replaced.  Arturi became a part-time employee, overseeing existing litigation and working on Callaway matters for the Carlsbad legal department two or three days a week, and working in private practice the remaining time.  (Arturi ¶ 56)

76.  The changes in employment in Chicopee and elsewhere occurred at various times, and for somewhat different reasons, although most were layoffs precipitated not from poor performance by the individual, but rather from business decisions in an effort to return to profitability.  The first such decision

was in mid-December 2003, when a limited number of positions performing functions that were redundant to those being performed by corporate officials in Carlsbad, duties such as the Director of Risk Management (Dennis Paren) and the Director of Taxation (Michael Lyon) were eliminated.  (Arturi ¶ 57, Rist  117, Penicka 22-23, 80)

77.  The decision, also made during the winter of 2003, to close the Ft. Worth, Texas Ben Hogan operations resulted in the closing of the Ft. Worth facility and 22 office and factory employees being laid off from their positions, between April and the end of May 2004, when the facility was entirely closed.  (Arturi ¶ 58, Answers to First Set of Interrogatories, Lonczak 22, 25-27)

78.  As a result of the decision that CALLAWAY branded golf balls would be manufactured by TFGC in Chicopee, rather than being manufactured in California, led to the layoff of factory employees who had been working for Callaway manufacturing golf balls in California.  (Fry 14)

79.  That same decision, however, while causing the layoff of some in California has been a "life-raft" if not a boom for factory employees working for Defendant in Chicopee.  Thus, while there has been a dramatic decrease in the number of office employees working in Chicopee, by virtue of the integration, and specifically the decision to move the manufacture of CALLAWAY brand golf balls to Chicopee from California, there has been a commensurate *increase* in the number of factory employees working in Chicopee.  The number of factory employees in Chicopee has increased from 531 when the new Company started to 573 as of April 2006.  The number of direct supervisors for the factory

employees (included as part of the salaried office group) has also risen in this period, or the numbers of current office employees would be even less than it is. (Arturi ¶ 59, Answers to Interrogatories, First Set)

80. The consolidation of golf-ball manufacturing in Chicopee appears to have been all the more fortuitous for Chicopee since the number of TOP-FLITE brand balls being manufactured and sold has continued to decrease since the bankruptcy, while the number of CALLAWAY brand balls has dramatically increased. More importantly, the estimated wholesale value of the CALLAWAY balls being produced in Chicopee by 2005 exceeded the value of the TOP-FLITE branded balls. Although in 2006 Chicopee manufactured fewer total balls than it did in 2002, the change in the mixture of brands has provided greater wholesale income from golf ball sales, even with fewer balls, in 2006 as compared to 2002. The 2005 wholesale income from TOP-FLITE balls, as compared to 2002, shows that more than ½ the income being generated by the Chicopee facility comes from its production of CALLAWAY brand golf balls. (Supplemental Response to No. 4 of Plaintiff's Second Request for Production of Documents)

81. The transformation of the Chicopee office workforce occurred in spurts commencing in December 2003, and resulted in the Plaintiff's layoff in 2004. (Arturi ¶¶ 96-100)

82. The prior management team had articulated that the losses that resulted in its bankruptcy were related to the debt service. Thus, when recruiting Kelleher, Rist had indicated that the reason for the bankruptcy was the debt that their financial buyers had placed upon them. Shortly after arriving and examining the books,

Kelleher came to the conclusion that the problems at TFGC went well beyond debt service and were more operational in nature.  In Kelleher's view, the expenses were out of control from an operating standpoint and market share was declining radically.  He also discovered that, at least in his opinion, the Company was improperly costing its products so that the books did not reflect real life, real expense costs.  When appropriate adjustments were made, the picture grew even worse.  Kelleher relayed his concerns to Penicka in December and soon thereafter the entire OCM, senior management team.  (Kelleher 96-97, 103-105)

83. Thus, from the time TFGC was created in September 2003, through the end of the calendar year, the new Company lost nearly nine million ($9,000,000) dollars, suffering a net loss of $8,818,000 in less than four months.  (Defendant's Response to Second Request for Production of Documents #3, and Exhibit 2 to said request, Arturi ¶ 60)

84. In December 2003, Kelleher told Penicka that the employee structure that the Company had in place was to support a much larger organization and that in order for the Company to be successful, it needed to correct its staffing levels. (Kelleher 18)  In December 2003, Kelleher projected that the Company would incur significant losses in 2004.  (Kelleher 106)

85. In fact, there had been a discussion shortly after the Callaway purchase as to whether to have involuntary layoffs.  The members of the OCM recognized that the new Company needed to restructure, "to bring our company back in line with just what was left.  Plain and simple it did not take as many support personnel to run the company" after the divestitures that had occurred.  However, unsure of

just what the impact would be upon the Company, the Operating Committee decided to put it off for a short period of time.  (Rist 103-104, 126)

86.  The losses continued in 2004, although at a lesser rate due in part to the efforts to reduce costs, including the layoffs that were taken.  However, in 2004, the new Company suffered a net loss of $15,950,000 for the twelve month period.  (Defendant's Response to Second Request for Production of Documents #3, and Exhibit 2 to said request).  With sales eroding faster than forecast, had the Company not made the cost reductions it did in 2004, the losses would have been significantly higher.  (Kelleher 141)

87.  By February or March of 2004, based on the volume of sales being pre-booked.  Kelleher determined that the projected company revenues for 2004 would not be met.  Although Defendant had already projected a loss of revenue, it now appeared that the actual drop in revenue would be significantly greater than its initial projections, thereby increasing the projected losses if action wasn't taken to reduce costs.  (Kelleher 106, Penicka 41-43)

88.  In March 2004, the OCM held an off-site retreat at the Hilton Garden Inn in Springfield to discuss the situation that the Company was facing – *i.e.,* the negative profitability of the Company.  The meeting lasted all day and the senior managers discussed the need for layoffs and the strategy for the business.  Kelleher gave a bleak presentation on the financial situation of the Company, indicating that it was in financial trouble.  Its operating expenses significantly exceeded its operating income or revenue.  The discussion revolved around how the Company could try to correct the situation either by increasing sales or

reducing costs or some combination thereof.  No decision was reached as to whether or not to have layoffs.  It was decided that each manager needed to evaluate his or her own organization to determine whether or not it had the correct head count to support our organization.  Penicka gave each OCM manager the task of making such an assessment for his own department. (Kelleher 17-30, Arturi ¶ 61)

89.  The issue was addressed at a follow-up staff meeting held a week or two later in Chicopee.  Kelleher discussed how the financial situation would not get any better based upon trying to increase revenues and stated that the Company had a bloated organization, inherited from Spalding, from the vantage point of head count and spending.  It was decided that the senior staff needed to come back with concrete recommendations for a reduction in force as well as reduction in expenses.  There was a decision made to have a layoff at that time, but no discussion targeting how many people, or how much money would need to be saved by a layoff, or as to what other expenses to cut.  (Kelleher 17-30, Arturi ¶ 62)

90.  There were steps to cut discretionary spending.  These included reducing marketing expenditures associated with printed media; marketing expenditures associated with free goods as well as efforts to reduce insurance-related costs. (Kelleher 28)  It was also decided that the retail store would be closed. (Arturi ¶ 63)

91.  The decision to have layoffs occurred two to three weeks before the individuals were actually informed.  (Penicka 41)  Because of the growth in the

manufacturing of CALLAWAY brand balls in Chicopee, the full complement of factory employees were needed, and there would be no layoff affecting the factory. (Penicka 43)

92. The focus was to be on eliminating office functions seen as non-essential to the profitability of the business. (Penicka 53) Each manager was to perform a review of the functions being performed by his reports and decide if reductions could be made. (Rist 110, Fry 25) No one set a fixed number of employees or dollar figure that each manager had to remove from his department. (Kelleher 17, 34, Rist 130) Each manager had to come up with a plan to properly staff his or her own organization. (Kelleher 33, Penicka 36, 48-49[10])

93. On or about April 15, 2004, 41 Chicopee office employees (as well as seven (7) field sales personnel) received letters indicating that they would be laid off. The letters noting the Company's ongoing financial losses, indicated:

> It is necessary to match current levels of overhead with projected revenues. Unfortunately, a downsizing of the Top-Flite workforce is being implemented. This action will impact many employees, at all levels, and as a result your employment has been terminated from the company effective today, with your salary continued through April 30, 2004.

> (See Behaylo Dep Ex. 10, Arturi ¶ 64)

94. The letter went on to offer a severance package, which was being expressly offered in consideration of a release of claims against the company, and gave the

___

[10]The sole exception was in the Sales area. As with the other organizations, the Vice-President of Sales, Tursi, made recommendations to eliminate some people within the sales function. However, unlike other departments, the President took it further, laying off Tursi himself and two marketing vice-presidents, as described above, based on his view that they were the people who established the sales and marketing programs that were not working, and because they did not have the golf industry experience or industry connections that he believed important. (Penicka 36, 48-49, Kelleher 129-130)

employees twenty-one days in which to consider whether to accept.  The benefits were tailored to the individual being affected, and set forth contingencies for the receipt of the severance, including a release of claims.  It provided information relevant to the receipt of unemployment compensation and COBRA benefits.

Paragraph 8 of the letter stated:

> In consideration of the payments made to you under this letter, which are in addition to compensation you would otherwise be entitled to upon separation from Top-Flite, and except as provided above, you release Top-Flite, its parent, subsidiary, and affiliate companies, and its and their and its respective shareholders, directors, officers, employees, and agents from all debts liabilities or obligations to you whatsoever, whether known or unknown, which may now exist, including without limitation, any arising under any federal, state, or local law regarding employment discrimination or termination.
>
> You acknowledge that no representations have been made to influence you to sign this letter except those provided above.  You also acknowledge that you may consult with your personal advisors, including an attorney of your own choice, and that your signing this letter is voluntary and with full understanding of its provisions.  You understand that by signing this letter you are, among other things, giving up any claims or rights you may have under the laws referred to above.  This offer will automatically be withdrawn if not accepted within twenty-one days.
>
> Id.

95. All employees were provided the full amount of time, if not more, to consider whether to agree to the severance package.  All employees agreeing to the offer and signing the agreement received the severance payments outlined in their individualized severance package.  No employee has ever tendered back any severance payment prior to commencing legal action against the Defendant.

(Arturi ¶ 65)

-36-

96. Employees laid off in April of 2004 were not provided with demographic information indicating which employees had or had not been laid off and offered severance payments in exchange for a release of claims.  The Company later did commence that practice after being sued by several individuals who had received significant severance payments, signed a release, and thereafter commenced a lawsuit.  (Arturi ¶ 66)

97. In late May of 2004, in response to communication from an attorney of an employee laid off in April, Peter Arturi, General Counsel, requested that an analysis be prepared to show the age impact of the April 30, 2004 layoffs.  The data prepared showed that the average age of the Chicopee salaried workforce before April 15, 2004 was 44.3.  After the layoff the average age was 44.4.  The average age of the Field Sales Offices prior to the April 15, 2004 terminations was 41.2, the average age after was 40.9.  (Arturi ¶ 67, Rist Dep. Ex. 3(D))

98. While the overall numbers of office employees has been dramatically reduced, the demographic profile of the office employees was not altered significantly between September 2003, when TFGC was formed, and May 2006 when it responded to Interrogatories.  Thus, at the time it was formed, 29.7% of office employees were over the age of forty.  The percentage over forty has *increased*, and by May 2006, 31.6% of the office employees were over the age of forty. (Answers to Interrogatories, No. 6, Arturi ¶ 68)

99. There were, as of April 2006, a total of 110 exempt salaried employees (Plaintiff's categorization) remaining employed by TFGC.  Of the 110, thirty-five (35) were over fifty years of age.  (Arturi ¶ 69)

100. The Company has continued to reduce the number of exempt office employees, particular in the G&A and Sales classifications, which included Plaintiff's classification. Thus, since its inception, the Company has assigned a classification to each exempt salaried employee. These classifications included Sales, Manufacturing, G&A (general and accounting), marketing, customer service, etc. At the present time the total number of salaried exempt employees in Chicopee is down to ninety-one (91). Not only is the total number of exempt salaried office employees a fraction of what it was in September 2003, many classifications within that category have been entirely eliminated or nearly eliminated. When TFGC was formed in September 2003 there were eighty-six exempt salaried employees in the "sales" classification category, including eleven working out of Chicopee. There are now, in November 2006, none. There were eight (8) salaried exempt employees classified as International, including Paul Duval. There are now none. There were twenty-six (26) in the classification of R&D (research and development). There are now six (6) and all but one will be eliminated by April 30, 2007. The one remaining will be Kennedy, whose role has already changed from a department manager to an inventor reporting to the Senior Vice President of R&D in Carlsbad. There were 60 in the G&A Category, which includes accounting functions, human resources, legal support, the company store, etc. There are now a total of only 19. On the other hand, there were sixty-two (62) salaried exempt employees in the classification of manufacturing in September 2003 (including factory supervisors, engineers, etc.)

Consistent with the increased manufacturing operations there are now sixty-six (66).

### With The Impending Transfer of Ben Hogan Club Procurement and Assembly to Carlsbad, Gary Lonczak is Laid off

101. Gary Lonczak was a Category Logistics Manager when he was laid off in April 2004.  He was 51 years of age at the time, earning a salary of $81,000. (Answers to Interrogatories First Set, Interrogatory No. 4, Lonczak 15)

102. Reporting to Lonczak was Susan Silvestri, a Senior Planner, whose salary was more than $30,000 less than her manager, Lonczak.  Lonczak reported to Daniel Zanetich, the General Manager of Supply Chain, who was laid off at the same time as Lonczak.  (Lonczak 23, Answers to Interrogatories First Set)

103. Lonczak began to work for Spalding in 1998.  His job responsibility throughout his employment was materials manager for golf clubs.  (Lonczak 12, 23, Answers to Interrogatories First Set)

104. When TFGC was established, TOP-FLITE golf clubs were being manufactured or assembled either in China or at the Ben Hogan facility in Ft. Worth, Texas. Lonczak would travel to Texas several times a year.  He would also travel to suppliers both overseas and throughout this country.  Any assembly of golf clubs that had previously been done in Chicopee had ceased.  (Lonczak 14, Fry 57)

105. Not long after the TFGC was formed, Lonczak was informed that by May of 2004 Callaway was going to shut down the Ben Hogan golf club facility in Ft. Worth and move the work to Carlsbad, starting a new production line, integrated with its production lines for CALLAWAY golf clubs.  (Lonczak 22)

106. Lonczak worked as part of a Transition Team responsible for the closing of the Texas facility and the transfer of the work to Texas. (Lonczak 26)

107. Part and parcel of the decision to transfer golf club assembly to Carlsbad was the decision that the future procurement and planning functions for the BEN HOGAN brand, work that served as the core of Lonczak's job responsibilities, would also be done by personnel working for Callaway in Carlsbad. (Fry 60)

108. At that time Callaway's "game plan" was to have everything in Carlsbad by June 2004, with full integration being completed by the fall of 2004. (Fry 60) Thus, in mid-April of 2004, Tom Fry was of the belief that Ft. Worth would be closed, and all Ben Hogan planning and procurement would soon be performed in California. (Fry 61)

109. In fact, the first portion of the plan, the closing of the Texas facility, the transfer of inventory, and the commencement of assembly in California stayed more or less on schedule. (Fry 61)

110. In addition to BEN HOGAN clubs, about 25-30% of Lonczak's work involved TOP-FLITE golf clubs. However, by the beginning of 2004, and before the decision to lay Lonczak off, the Company had decided not to pursue business for TOP-FLITE clubs. (Fry 57)

111. Accordingly, in April 2004, at the time all OCM members, including Fry, were told to look at their respective organizations and determine what they needed to operate efficiently, Fry did not contemplate needing anyone to perform *any* of Lonczak's functions for a significant period of time. (Fry 25, 62)

112. The fact that this transfer was underway, and the possible impact that might have on his own job, was at least suspected by Lonczak prior to his being told of his layoff.  Thus, even while Lonczak was working, all of the planning and procurement records were being transferred to California, making Lonczak "suspicious" that his position would change.  (Lonczak 34)  Indeed, in his Spring 2004 self-evaluation, Lonczak himself noted the need to work on career planning for himself and his direct report, the two employees in Chicopee directly responsible for BEN HOGAN golf club planning and procurement, "post the business transfer."  (Lonczak 32)

113. By the time Lonczak was laid off, all the BEN HOGAN inventory in Texas had, with limited exceptions, already been transferred to California.  (Lonczak 27)

114. In Fry's mind, once it was decided that the Texas operation was going to move to California, Lonczak's job would not be needed, as the job simply would no longer exist.  (Fry 29-30)

115. On April 15, 2004, Tom Fry told him that the company needed to make organizational changes based on the financial results of the company, that they were restructuring and that there had been a decision to transfer his duties to Carlsbad over the next three months.  (Lonczak 43)

116. Although there was a position open for a golf ball planner for Lonczak's much lower paid subordinate, Susan Silvestri, there were no suitable vacancies for Lonczak.  (Fry 69-70, Lonczak 46)

117. As with other employees being laid off, Lonczak was given a termination letter containing a release of all claims.  He was given sufficient opportunity to review

the release of claims, which he did prior to signing it.  Lonczak understood the document, including the fact that he was forfeiting his right to bring legal action. He had no questions about the document's meaning.  He proceeded to sign the agreement with its release of claims.  (Lonczak 47, 53, Lonczak Dep. Ex. 8)

118. Pursuant to the terms of the agreement, Lonczak continued to receive his full salary from April 15, 2004 through August 27, 2004.  He also received unemployment compensation of almost $15,000 in 2004, and worked part-time for Barnes Aerospace, earning another $5,700.  In early 2005, he moved to Texas to open his own business, the Dreylon Sports Company, partnering with the former Ben Hogan facility plant manager, Steve Dreyer, who was laid off a month after Lonczak.  (Lonczak 59, 63-64)

119. As noted, the part of the original plan involving closing Texas, relocating inventory, and commencing assembly in California, had proceeded on schedule. Furthermore, the planning function that was a part of Lonczak's job, *i.e.,* the determination of what to build on a daily basis, had also, as planned, been assumed by employees working in California.  (Fry 63-64)

120. However, in the late summer or early fall of 2004, several months after Lonczak had been terminated, a decision was made by Callaway that it would delay the full integration of BEN HOGAN clubs with CALLAWAY clubs (from a procurement and manufacturing viewpoint) to allow further study of what computer system to utilize.  Thus, both TFGC and Callaway used integrated computer systems that tracked everything from inventory to production finances as an integral part of their manufacturing process, including the procurement process.  However, they

each used a different system, and the two were incompatible with each other.
TFGC utilized the QAD brand system, Callaway, a SAP brand system.  (Fry 62-63)

121. When Callaway made the decision to delay full integration and revisit which
computer system to integrate to, Fry had to decide how to cover what remained
of Lonczak's prior position for what now appeared was going to be a longer
period than he had previously anticipated.  Working for TFGC in its IT
(Information Technology) department was Rosanne Turner.  Turner initially had
been employed by Spalding in the Logistics Department, reporting to Esch.  In
February of 2003, like Lonczak, she became a manager of Category Logistics
Manager.  (Personnel Actions Form, Turner, Produced in Response to Second
Request for Production of Documents)

122. Unquestionably competent, Turner, age forty, had been a peer of Lonczak,
performing procurement work similar to Lonczak, albeit on products other than
golf clubs.  On or about February 19, 2004, she had been transferred to the IT
department, and was working for Christine Rousseau as a Projects Manager.
(Personnel Actions Form Turner Produced in Response to Second Request)
Turner was coordinating a project that entailed migrating the department's
information databases into a QAD computer system.  (Lonczak 73)  She had
served as a conduit of information flow between the technical IT department and
Spalding's planning organization.  (Lonczak 74)

123. With the planning work being done in California, Fry decided that he could utilize
Turner to take over what was left of the golf club procurement role for whatever

period it took for Callaway to revisit the systems issue and finalize the process. Fry knew that they would consolidate the two systems and that continuing golf club procurement responsibilities for BEN HOGAN, although lasting longer than he had anticipated in April, was still going to only be a temporary responsibility for a Chicopee employee.  He was confident that since Turner was knowledgeable in both the QAD and SAP computer systems, as well as knowledgeable and experienced in procurement, she had all the requisite skill sets that would be needed for whatever period the transition would now last.  (Fry 65-66)  Her computer program expertise was viewed by Fry as particularly significant because the issues that were delaying the total integration were not related to manufacturing problems, but rather computer system issues.  (Fry 32, 34, 71)

124. Turner, in the fall of 2004, on a temporary basis, began to perform about 60% of the work that Lonczak had performed.  However, eventually, by November 2005, the integration was completed and Turner ceased, entirely, performing any work previously done by Lonczak.  She then returned to her position in the IT department.  (Fry 33, 67-68, Lonczak 68)

Respectfully Submitted,

_/s/ Jay M. Presser, Esq._
Jay M. Presser, Esq.
BBO #405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:  November 30, 2006     Tel. (413) 737-4753/Fax (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Defendant's Statement of Undisputed Facts* was served upon the attorney of record for each other party via electronic filing on November 30, 2006.

_/s/ Jay M. Presser, Esq._
Jay M. Presser, Esq.