*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

GARY J. LONCZAK,

                         Plaintiff,

vs.

THE TOP-FLITE GOLF COMPANY,

                         Defendant.

CIVIL ACTION NO. 05-30179-KPN

**DEFENDANT'S REPLY BRIEF TO OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT**

## I.    The Facts

Defendant, The Top-Flite Golf Company ("Defendant", "TFGC" or the "Company"), filed an extensive Statement of Undisputed Facts. *None of the facts as alleged by Defendant have been disputed by Plaintiff's filings, and accordingly, must be viewed as admitted.* Thus, while Plaintiff filed a document captioned "Statement of Disputed Facts", Defendant has filed a Reply to said document which, point by point, addresses each of the alleged "disputed" facts contained in the Plaintiff's Statement. Said response, incorporated by reference herein, notes that most of the facts, at least those properly supported by the referenced citations[1], are, in reality, not in dispute at all. A few occasions the so called "disputed facts" are simply additional facts, most of which

---

[1]Plaintiff's Memorandum cites to facts in his Statement of Disputed Facts. However, to the extent that the memorandum cites facts that are not properly supported by the cited materials (or in some cases, actually contradict the cited materials), they cannot be relied upon to defeat the Motion for Summary Judgment. Nor can those, such as Duval's financial analysis of the company's problems, that are not based on first-hand information.

1

remain, following the Defendant's Response, undisputed.[2]  Indeed, there is only one

fact properly raised and supported about which there is contradictory evidence, and

while the court must accept the version of that fact most favorable to Plaintiff, it is not a

material fact.[3]

At the end of the day, the facts, including the numerous admitted facts in

Defendant's Statement as well as the additional new facts added by Plaintiff, simply

would not support the conclusion that the Plaintiff was terminated due to his age.

## II.  Reply Argument

## A.  No Facts Point to A Discriminatory Intent in the Inclusion of Lonczak Amongst those Laid Off

Defendant's Statement of Undisputed Fact sets forth 24 specific facts relating to

the Plaintiff's layoff.  None is disputed in Plaintiff's Statement of Disputed Fact.  Nor

---

[2]Thus, there is no dispute that a woman from Callaway indicated that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 20 years.  It is the relevance of that fact that is disputed.

[3]The only actual disputed fact relates to the claim at ¶ 15 of the Plaintiff's Statement of Disputed Facts, where, discussing the possibility of a potential age discrimination suit from an older field salesman, David Richardson alleges that Bosworth responded that "you should just fire a couple of young guys along with the old ones and no one would notice."  Bosworth had denied making that statement and said that he indicated he wasn't concerned about discussing non-existent lawsuits.  The affidavit of another Plaintiff witness, Gielow, also does not assert that Bosworth told managers to layoff young people but rather asserts that "Mr. Bosworth's response was that we should do what we needed to do to cover ourselves."  The court must, of course, accept Richardson's uncorroborated assertion for purposes of this motion.  However, as noted in the response to the Defendant's Statement of Undisputed Facts, "Accepting Richardson's account would support the conclusion that Bosworth suggested that a few younger people be unjustly terminated to assist in the defense of a lawsuit brought by older workers eliminated when, according to Richardson's phrasing, the "dead weight" was culled.  It does not support a directive that someone would be fired because they were old.  Thus, at best, it is a cynical suggestion as to how the dead weight in the sales force could be eliminated without incurring a successful lawsuit.  At most, it shows that Bosworth was willing to sacrifice some unfortunate younger employees to rid the company of 'dead weight.'"

2

does Plaintiff's Statement of Disputed Facts present a single additional fact supportive of Mr. Lonczak's age discrimination claim, except to the various remarks that Plaintiff contends establish the existence of a pervasive discriminatory age bias permeating throughout the company.  Significantly, there isn't even a claim that Tom Fry, the decisionmaker in Mr. Lonczak's case, made a single remark denigrating the experience or value of long-time employees.  There is no claim that the decisionmaker in Lonczak's case made even a single comment referring to the "old" regime, or "old ways" of doing business.  Most importantly, there is not only no allegation that Fry ever made any comment denigrating Plaintiff or any other employee because of his age, or indeed, that he harbored any animosity towards anyone based on age.  Despite the absence of such evidence, or perhaps because of it, Plaintiff attempts to build a case that Callaway's entire management was infected by age bias, relying upon the recitation of a variety of comments that purportedly show this discriminatory mindset against older employees.  Thus, Plaintiff asserts that beyond Robert Penicka's statement at the Chamber of Commerce, there are other statements and actions that demonstrate this so called deep and abiding age bias.[4]  Those comments, not attributed to Fry, as will be discussed below, demonstrate no such thing.

---

[4]Defendant's Statement of Undisputed Facts ¶¶ 64-71 contains details of Robert Penicka's remarks at the Chamber meeting.  The Plaintiff did not properly challenge any of the facts alleged therein, but merely quoted from ¶ 69 and stated, "The nature of Mr. Penicka's statements at the Chamber of Commerce are not substantially disputed."  (Plaintiff's Statement of Disputed Fact ¶ 11)  Nevertheless, at footnote one of his Memorandum Plaintiff attempts to circumvent the requirements of Local Rule 56 and contest the additional facts submitted, all of which are properly supported by admissible, and undisputed evidence.  Thus, he asserts that "it is highly unlikely" that a Chamber member would ask the new president a question about age.  He then indicates that it is notable that Penicka's "version" of what was said is supported only by decisionmakers.  Defendant was clear that to the extent there was any conflict the court was obligated to credit the version most favorable to Plaintiff, and assumed it was the Duval version.

Lonczak, from his position in Chicopee, was a manager who served as the liaison with the Texas assembly facility of Ben Hogan golf clubs.  In addition, he was responsible for the planning for the facility, *i.e.,* determining the work priorities of that plant so orders could be met.  He also did the requisite procurement for the facility.  It was thus obvious that Callaway's decision to close the Texas facility, and integrate it with its own golf club assembly operations in California, made the ultimate elimination of Lonczak's position *a fait accompli*, the only question being when it would occur.

The inevitably that these entrepreneurial changes, decided by the parent company, would result in the elimination for any need for his position was, quite clearly, fully recognized by Plaintiff himself.  Thus, at his deposition (at the pages cited at page 8[5] of Plaintiff's memorandum) Plaintiff himself stated that when the announcement of the Ft. Worth closing was made, "I raised questions about what that meant for my job

---

(*See* Defendant's Statement of Undisputed Facts ¶ 69)  However, Plaintiff misconstrues the nature of summary judgment if he is asserting that no other admissible evidence, if uncontradicted, can be submitted and relied upon.  Thus, Duval indicated that Penicka spoke for about ten or fifteen minutes but could only recall two sentences.  (Duval Dep. p. 195)  If not in conflict, the testimony of others can likewise be submitted.  Thus, despite counsel's opinion as to the probability, numerous witnesses recalled that there was, in fact, a question from a Chamber member.  This did not only include decisionmakers, but Christine Conti (p. 25) and Darlene Orciuch (p. 17).  Both were non-supervisory former employees, whose depositions were taken by Plaintiff when they were no longer employed.  Their testimony, as well as the testimony of Rist (not accused of making any discriminatory decision) and the other managers, can properly supplement the two sentences recalled by Duval.  There is nothing in the record, not even an affidavit from Duval, indicating that no one from the floor asked a question.  Accordingly, there is no basis not to accept, as an undisputed fact, that such a question was asked.  Similarly, while Duval's account of what was said by Penicka, to the extent it contradicts others, governs, that does not preclude Penicka from testifying in court, or in a summary judgment affidavit, as to matters that occurred before the comment was made or his thought processes.

[5]These pages were, undoubtedly, inadvertently not included in the materials served on Defendant, but presumably were filed with the court.

4

and Susan's, *because I felt that if that part of the golf club operation was going to go, inevitably my job would go there as well too*." (emphasis added)

As result of knowing that his job would inevitably be absorbed in California Plaintiff did what any smart manager would, he negotiated.  Thus, at a time when he knew his services were needed to assist in the transition of the Ben Hogan line (a transition that started in February 2004), he "made Dan [Zanitech] understand that I needed to watch out for myself, and possibly seek other employment if an opportunity came by because I didn't have a severance agreement…"  Id.  The Company's response was *not*, as alleged in his memorandum, "reassurance that he didn't have to", at least not in the sense of indicating that his continuing employment prospects were good notwithstanding the transition.  Rather, as Plaintiff's deposition testimony states, the sensible business response was that Zanitech "came back with a severance letter granting the severance in the event that [the position] went away."  Id.

There is no question that, at least by the fall of 2005, no one was performing any of the work previously performed by Lonczak.  The only legitimate question is whether the timing of his layoff, April of 2004, rather than fall of 2005, was for the reasons articulated by the Company or whether those reasons are a pretext for age discrimination.

Thus, there is no dispute that when deciding to layoff Plaintiff, Tom Fry elected to utilize an incumbent employee, Roseanne Turner, who had been a counterpart to Lonczak, both to initially cover as the Hogan Transition Project Manager for what, at the time he thought would be a very brief assignment, and then, later, to continue as the Director of Golf Club Sourcing when Callaway, belatedly, indicated that it was delaying

5

the full integration, and was not during the period it would take to study the software

question, going to assume responsibility for Ben Hogan golf club procurement, as it

already had for Ben Hogan golf club planning[6].  Thus, there is no dispute that Turner did

some (although not all) of the work traditionally done by Plaintiff from shortly after his

departure, which was planned by Fry.  It is also undisputed that Turner continued to

perform some of those duties through the fall of 2005, which was not anticipated by Fry

in April 2004.  However, even if the court finds that Turner's temporary assignment and

performance of some of Lonczak's duties during either the abbreviated or the extended

period is sufficient to constitute Turner "replacing" Lonczak, thus satisfying the fourth

prong of the *prima facie* case[7], that would not create a genuine issue of material fact as

---

[6]Plaintiff has presented Turner's personnel file without explanation, as Exhibit 28.  The documents support, rather than contradict Defendant's Statement of Undisputed Facts.  Thus, the documents show Turner was initially transferred from IT in May, to work as "Hogan Transition Project Manager" (*i.e.,* coordinating the last months of the transition).  Defendant does not dispute, as Lonczak's affidavit states that he was doing that work at the time he was laid off.  That is not inconsistent with the claim that in April 2004, Fry believed that neither Lonczak nor anyone else would have to continue to do that job for much longer, making Lonczak someone who could be laid off even though some of the transition related work he was performing was expected to continue for a short period.  (*See*, Defendant's Statement of Undisputed Facts ¶ 111, Fry did not contemplate needing anyone to perform *any* of Lonczak's functions *for a significant period of time*.)  Lonczak's affidavit then notes that the job title Turner assumed in September of 2004, *i.e.,* Director of Golf Club Sourcing, was also the "same job that I had", presumably referring to his core job.  Again there is no dispute that following Callaway's decision to delay full integration, pending a review of the software issue, Turner performed the procurement work that had been a part of Lonczak's job.  (It is undisputed that the planning work had ceased before then)  Defendant's Statement of Undisputed Facts ¶ 120 indicated that Callaway's decision to study the software issue occurred in late summer or early fall, consistent with the appointment of Turner as "Director of Golf Club Sourcing" in September 2004.

[7]Plaintiff incorrectly asserts that the fourth prong of the *prima facie* can be demonstrated by showing that "there was a continuing need for the services provided by the position for which he was discharged."  That is the standard for a simple discharge case, not for a case involving a reduction in force.  Thus, while Plaintiff cites Currier v. United Technologies Corp., 393 F.3d 246, 254 (1st Cir. 2004) in support, that case shows the court using a different standard.  Thus, the court noted that "[i]n the context of a RIF, the fourth prong could be met by showing not merely a continuing need for the services, but rather that 'younger persons were retained in the same position or that the employer otherwise did not treat age neutrally.'"  A similar approach is

to the ultimate issues of pretext and age discrimination.  Rather, to avoid summary judgment there would need to be evidence that would allow a reasonable jury to conclude that in making his decision in April 2004, Fry was not acting based in good faith for lawful reasons, but rather, that he laid off Lonczak at that time because of his age.

Importantly, any assessment regarding the lawfulness of the challenged layoff decision is controlled by what was known by the decisionmaker *at the time the challenged decision was made*, unaffected by the subsequent developments.  Here, specifically, the undisputed evidence demonstrates that at that time Fry, based on what he had been told by Callaway, believed that the Ben Hogan integration would be completed by June 2004 and that California personnel would, at that time, be solely responsible for the product.  Indeed, Lonczak himself testified that when he was notified of his layoff in April, he was told that his duties would be absorbed by Carlsbad personnel "over the next three months."  (Defendant's Statement of Undisputed Facts ¶ 115)  Nothing in the record draws into question that Fry, at the time he decided to layoff Plaintiff, believed that to be the case.  That being the case, the fact that the actual integration was subsequently delayed by a decision made by Callaway to review what operating system to use is entirely irrelevant.  *See, e.g.,* Jaramillo v. Colorado Judicial Dept., 427 F.3d 1303, 1314 -1315 (10th Cir. 2005) (the alleged irregularities occurred after Mr. Sandoval was promoted.  They are, therefore, irrelevant to the question whether Ms. Donovan's decision to promote Mr. Sandoval was motivated by discriminatory animus."); Moore v. Eli Lilly & Co., 990 F.2d 812, *816 (5th Cir. 1993)

---

used under M.G.L. c. 151B.  *See* Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 42, 825 N.E.2d 522, 532 (Mass., 2005).

("The fact that the employers' reasonable belief eventually proves to have been incorrect-if, for example, Moore were eventually to be vindicated from the charges of falsifying records-would not change the conclusion that the firing had been non-discriminatory"); Palmer v. Danzig, 2001 WL 1512578, *9 (E.D. La.) (E.D. La., 2001) ("The fact that the employers' [sic] reasonable belief [in its reason for adverse employment action] eventually proves to be incorrect . . . would not change the conclusion that the [action] had been non-discriminatory.")

At the time he made the decision Fry was operating under a directive to review his organization and eliminate unnecessary positions.  At the time he made the decision Fry knew *some* of Lonczak's functions had to be continued for a few more months, but also *reasonably*[8] *believed* that *all* of Lonczak's duties would fully disappear within the next few months (as *some* did[9]) making Lonczak's position entirely superfluous at that time.  Defendant has never contended otherwise.  (*See*, Defendant's Statement of Undisputed Facts ¶ 111)  "Fry did not contemplate needing anyone to perform *any* of Lonczak's functions *for a significant period of time.*  (Defendant's Statement of

---

[8]In this context, it is per se reasonable, and not subject to second-guessing, for a manager to make his personnel decisions based on what his superiors advise him will occur regarding business matters within their control.  If, as here, Fry is told that the California facility will assume certain duties, it is reasonable to accept that when making his own decisions.

[9]There is no dispute that with the physical closing of the plant in Texas, and its move to California, the planning portion of Lonczak's responsibilities was taken over by Callaway personnel in California.  Thus, in July, Susan Silvestri, who had worked on planning with Lonczak, ceased those duties and was transferred to a similar vacancy in golf balls.  (Plaintiff Dep. Ex. 27, ¶ 3, Defendant's Statement of Undisputed Facts ¶ 102)  Those duties were not performed by Roseanne Turner or anyone else working in Chicopee.  (Plaintiff has produced an affidavit from Silvestri.  The affidavit is lacking in sufficient detail to create a material issue of fact.  Thus, the affidavit, which doesn't indicate what type of work was being done (planning procurement, transition related) by Turner prior to July 2004, when Silvestri was in the department, nor after she left.)  The fact that Turner, unexpectedly, continued to do some work for an extended period is not in dispute.

8

Undisputed Facts ¶ 111) (Emphasis added)  Nothing presented by Plaintiff calls that crucial fact into question.

Given that, the reasons proffered for Lonczak's layoff can hardly be viewed as a pretext for age discrimination.  Thus, in April of 2004, losing millions of dollars, Fry was told that the Company, losing millions, needed to reduce costs *immediately,* and that he, and all senior managers, needed to eliminate non-essential employees.  Lonczak certainly fit that description.  Thus, while Fry could have anticipated that Lonczak could be useful for another few months, to the extent that there was a <u>need</u> for anyone to perform any of the duties, the need was *expected* to be short-term.  He had the capability, with an internal candidate, of covering those duties in the short-term and still meet his duty to reduce costs.  The fact that there was work that Lonczak could do for a few months does not mean that, in the context of a reduction in force, it would seem that Lonczak was essential.  The fact that the job was expected to continue for a few months did not provide a basis for retaining an employee whose job was expected to disappear sooner rather than later.  Cost savings could, and in fact were, achieved by immediately laying off Lonczak, even if it was a month or two before his Manager of Ben Hogan Transition duties were expected to end, and temporarily assigning Roseanne Turner. Turner, like Lonczak had done procurement but was at the time performing IT work, a need which Tom Fry would reasonably expect would continue well beyond June 2004.[10]

There is nothing in such a decision that hints at age discrimination.  Turner and Lonczak both were with the Company a relatively brief period, Lonczak since 1998

---

[10]Indeed, in 2005, Turner returned to the IT department.  It is perfectly logical to fill in for the employee whose job is disappearing, rather than retaining that employee and laying off a person in a position that was expected to continue well into the future.

Turner since 2000.  Turner, too, was in the protected age bracket, albeit younger.  The

fact that Lonczak was older was simply a reflection that he was an older employee

when hired, it does not give him any claim to continuing employment in light of the

expected disappearance of his job in the near future.  Turner's job was the perceived

permanent one, his was the temporary position.   Fry could not be expected to separate

Turner to save money, keep Lonczak where he was for a few months, and then transfer

Lonczak to Turner's job.[11]

### B.  Claims of A Discriminatory Corporate Mindset Are Unsupported by Fact

### 1.  Ambiguous Statements and Comments about Seniority Don't Establish a Discriminatory Corporate Mindset

Plaintiff's attempts to substitute a vitriolic claim that "Callaway brought with it a

deep and abiding age prejudice" for actual facts showing that the actions taken by

Defendant were discriminatory.  Thus, without any real evidence that the layoffs in

general, or his in particular, was motivated by discriminatory animus based on age,

Plaintiff seeks to assert that the entire Company, and implied all its decision making

processes, was tainted by a discriminatory mindset.  However, there is absolutely no

factual basis for such an assertion.

Indeed, significantly, there is not even a claim that the Defendant engaged in a

pattern or practice of age discrimination, which one would expect if a new management

---

[11]While Plaintiff attempts to assert that he was qualified for IT work, given Fry's lack of
knowledge of such experience, even if true, it is irrelevant.  Given the fact that Defendant does
not award such positions based on seniority, it would be hard to think of a defense to a sex
discrimination charge brought by Turner if that scenario had been followed, and she effectively
lost a permanent IT job to a white male.

held the deep and abiding prejudice Plaintiff claims.[12]  Nor is there any statistical

evidence that layoffs, as effectuated, had any disparate treatment on older workers,

which would likewise be expected if management harbored such patent animosity

towards older employees.  Indeed, there isn't even evidence of a disparate layoff of

older workers within any subgroup overseen by a particular decisionmaker Plaintiff

asserts was infected with such bias.  Thus, for example, the Plaintiff attempts to build

his case on comments admittedly or allegedly made by James Bosworth, the Vice-

President of Sales (an individual who actually commenced his own employment after

the April layoffs were announced, precluding the possibility that Bosworth's views

tainted those of the decisionmaker in Plaintiff's case).  Moreover, the comments were

uttered at a meeting discussing the need to make changes in the field sales force,

where Plaintiff was never employed.  However, even at that, Plaintiff does not even offer

any statistical evidence that under Bosworth's direction, the sales department, in

general, or the field sales staff that was the subject of Bosworth's comments in

particular, got younger as a result of the actions taken by Bosworth.  Not only is there

the absence of such evidence, the evidence presented by Defendant, which is

undisputed, shows that the average age of the Chicopee salaried workforce actually

*increased* after the April layoffs and *that there is a higher percentage of office*

*employees in the protected age group since Callaway took over the operations than*

*there was before.*  (*See* Defendant's Statement of Undisputed Facts ¶¶ 97, 98)  After

---

[12]Such a claim would require evidence that there be systemic discrimination.  *See*, Lopez v. Metropolitan Life Insurance, Co., 930 F. 2d. 157, 160 (2d Cir.) *cert. denied,* 502 U.S. 880, 112 S. Ct. 228 (1991).  Isolated instances, which would include the age related separations of four (or even six) individuals due to their age, would not suffice given the widespread reductions.  *Cf*. Teamsters v. United States, 431 U.S. 880, 97 S. Ct. 1842 (1977).

11

two and one-half years of being operated by Callaway, thirty-five of the 100 exempt salaried personnel employed were over the age of fifty.  (Defendant's Statement of Undisputed Facts ¶ 37)

Despite the absence of such evidence, or perhaps because of it, Plaintiff attempts to build a case that Callaway's entire management was infected by age bias, relying upon the recitation of a variety of comments that purportedly show this discriminatory mindset against older employees.  Thus, Plaintiff asserts that beyond Robert Penicka's statement at the Chamber of Commerce, there are other statements and actions that demonstrate this so called deep and abiding age bias.[13]

---

[13]Defendant's Statement of Undisputed Facts ¶¶ 64-71 contains details of Robert Penicka's remarks at the Chamber meeting.  The Plaintiff did not properly challenge any of the facts alleged therein, but merely quoted from ¶ 69 and stated "The nature of Mr. Penicka's statements at the Chamber of Commerce are not substantially disputed." (*See* Plaintiff's Statement of Disputed Fact ¶ 11)  Nevertheless, at footnote one of his Memorandum Plaintiff attempts to circumvent the requirements of Local Rule 56 and contest the additional facts submitted, all of which are properly supported by admissible, and undisputed evidence.  Thus, he asserts that "it is highly unlikely" that a Chamber member would ask the new president a question about age.  He then indicates that it is notable that Penicka's "version" of what was said is supported only by decision makers.  Defendant was clear that to the extent there was any conflict the court was obligated to credit the version most favorable to Plaintiff, and assumed it was the Duval version.  (*See* Defendant's Statement of Undisputed Facts ¶ 69)  However, Plaintiff misconstrues the nature of summary judgment if he is asserting that no other admissible evidence, if uncontradicted, can be submitted and relied upon.  Thus, Duval indicated that Penicka spoke for about ten or fifteen minutes but could only recall two sentences.  (Duval Dep. p. 195)  If not in conflict, the testimony of others can likewise be submitted.  Thus, despite counsel's opinion as to the probability, numerous witnesses recalled that there was in fact a question from a Chamber member.  This did not only include decisionmakers, but Christine Conti (p. 25) and Darlene Orciuch (p. 17).  Both were non-supervisory former employees, whose depositions were taken by Plaintiff when they were no longer employed.  Their testimony, as well as the testimony of Rist (not accused of making any discriminatory decision) and the other managers, can properly supplement the two sentences recalled by Duval.  There is nothing in the record, not even an affidavit from Duval, indicating that no one from the floor asked a question.  Accordingly, there is no basis not to accept, as an undisputed fact, that such a question was asked.  Similarly, while Duval's account of what was said by Penicka, to the extent it contradicts others, governs, that does not preclude Penicka from testifying in court, or in a summary judgment affidavit, as to matters that occurred before the comment was made or his thought processes.

12

The comments by Penicka at the Chamber of Commerce meeting, as well as the background of his statements and the actual parameters of the changes he made to his own senior staff, none of which have been disputed, were addressed in detail in the original brief, and need not be repeated.  To that breakfast remark, Plaintiff now adds a variety of comments that, for the reasons cited below, neither individually nor cumulatively demonstrates the purported age bias of the speaker, much less a corporate mentality of age bias.

As discussed in greater detail below, the comments patently fail to create a material issue of fact regarding the purported corporate age bias for two primary and distinct reasons.  First, many of the comments relate to longevity with the Company (seniority) and not to age at all.  Secondly, those that do refer to age at all, such as references to the "old regime" are, at most, ambiguous remarks that are susceptible to interpretations which are in no sense discriminatory.  As a matter of law neither category of remarks creates a material issue of fact pertaining to Plaintiff's claim.

Thus, the First Circuit has expressly not allowed references to age to support an age bias claim, even at the summary judgment stage, when such comments, even if made, may realistically be interpreted in a way that does not reflect a desire to make age based decisions.  Thus, in Gonzalez v. El Dia, Inc., et al., 304 F.3d 63, 69-70 (1st Cir. 2002), the First Circuit Court upheld summary judgment for the employer notwithstanding an alleged "pattern" of workplace remarks demonstrating age-based animus.  In language applicable to Plaintiff's efforts here, the Court stated:

> Upon closer examination, however, the stray remarks she identified afforded an inadequate foundation for the requisite discriminatory intent.

13

In the first place, "stray workplace remarks," as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.  *See*, Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001); Laurin v. Providence Hosp., 150 F.3d 52, 58 (1st Cir. 1998) . . . .

Secondly, it is far from clear that the alleged remarks bespeak any age-based animus at all.  *See*, Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) (noting that "a statement that plausibly can be interpreted two different ways-one discriminatory and the other benign-does not *directly* reflect illegal animus") (emphasis added); Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996) ("'[A]mbiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent.'") (citations omitted; emphasis added); Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 329 (1st Cir. 1996) (same).

Some statements, such as those made by Mr. Mercado, merely displayed a measure of surprise that Gonzalez was still employed at El Dia, without either asserting or implying that she was too old to be working.  Moreover, Mr. Mercado's alleged use of the salutation "Mom" -- though no doubt insensitive, perhaps even rude -- hardly constituted a self-sufficient foundation for an ADEA claim, especially since these particular attributions -- motherhood and advanced age -- plainly are not synonymous.

Similarly, the remarks Ms. Ferre allegedly directed at Gonzalez are reasonably susceptible to interpretation simply as descriptions of the somewhat dowdy appearance and demeanor which Gonzalez herself acknowledges.  Moreover, the Spanish phrase "manias de vieja" ("old ways") did not unambiguously connote that Gonzalez was old, let alone too old, but rather that she acted in ways which did not appear in keeping with a person her age.  *See, e.g.,* Pearson v. City of Manhattan, 33 F. Supp. 2d 1306, 1315 (D. Kan. 1999) (holding that phrase "old ways" not evidence of ADEA age-based animus, as such terms "apply more to a person's state of mind than to a person's age"); Martin v. Ryder Distribution Res., Inc., 811 F. Supp. 658, 664 (S.D. Fla. 1992) (observing that simple references to the plaintiff-employees-as "good old boys" and "old-fashioned"-are insufficient evidence of age-based animus under ADEA), *aff'd*, 16 F.3d 1232 (11th Cir. 1994).  Nor did any other statement, attributed either to Mr. Mercado or Ms. Ferre, unambiguously communicate an age-based animus.  Rather, their remarks are readily susceptible to interpretations which are in no sense discriminatory.

For the same reason, as discussed individually below, the statements relied upon by

Plaintiff do not suffice to create even a material issue of fact.

14

As indicated, several of the comments do not relate to age at all, but are comments that, in one way or another, purportedly reflect a bias against (or in some cases merely a lack of respect for) the seniority of the employee.  Indeed, throughout his argument, the Plaintiff continues to intertwine a disregard or disdain for seniority with animosity based on age, despite the facts that these are now definitively recognized as distinct concepts.  Hazen Paper Company v. Biggins, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).  The significance and rationale of maintaining that distinction is clearly demonstrated by the facts here.  Thus, both Bettencourt and Behaylo, cost accountants released in April of 2004, had more seniority than Levandowski who was retained.  Even if their greater seniority was admittedly disregarded, and indeed even if there seniority was held against them, Levandowski was older than both.  Thus, even if the decision making process was tainted by a discriminatory bias against those with seniority, which is denied, it clearly did not equate to age discrimination, since the less senior and older Levandowski was the only cost accountant retained.

Beyond the legally incorrect assertion that bias against senior employees is the same as bias against older employees is the underlying reality that permeating Plaintiff's argument is the incorrect implication that the age discrimination laws were violated because TFGC failed to give sufficient weight to the past service of the Plaintiff and others.  Thus, for example, the Plaintiff's memorandum, at page four, attacks Mr. Bosworth's belief that longevity in a particular job is not the same as relevant experience, as if such a belief was demonstrative of age discrimination in any fashion.  Similarly, the fact that Kelleher indicated that "anything that happened before 2003 [when the new company was formed] was meaningless" is cited to support the assertion

15

that even at deposition Kelleher "could not restrain his discriminatory attitudes…" (Plaintiff Brief p. 5)[14]  The Defendant is taken to task for terminating Plaintiff's employment, notwithstanding the undisputed evidence that it was losing millions of dollars, without Defendant fully exploring what other positions he could possibly do. Such an argument is based on the underlying, incorrect, implication that there was some legal obligation for the Defendant to try to continue to employ Plaintiff in these circumstances, presumably in consideration to his past service.  The failure to search for a reason or excuse to continue to employ an employee, when it is clear that the employee is not needed in his own job, even if they were capable of performing other jobs, simply is not indicative of age discrimination.  When a company is obviously looking to reduce headcount, and if the job an individual was performing is no longer required, why would the company be expected to review what else the employee might be able to do?  The failure to do so raises no bona fide suspicion that the actions are motivated by consideration of age.

Nor would a company be expected to maintain the services of an employee because it might, at some later point, be necessary to hire additional staff to perform some of the more mundane tasks, leaving the remaining experienced employees more time to perform the duties that actually require their skills.  Thus, even if the court were to assume that in April 2004 the Company knew that several months later it might need an entry level accountant (a fact clearly not supported), why would a company losing

---

[14]Other absurd examples cited include the fact that he referred to the organizational chart as the one he "inherited", and the fact that there were a lot of legacy folks that had been around with Spalding.  Both were obviously true.  Moreover, these comments, like the others described in greater detail below, are not age related at all.  At most they reflect a lack of respect for those who had worked for the bankrupt predecessor company.

millions of dollars be expected to not immediately eliminate more than $100,000[15] in salary and hire a lower cost entry level new college graduate when and if the need arose?  Even discarding the fact that companies sometimes end up cutting too deeply, without any sinister intent, and must then adjust when the capacity of the remaining staff to handle the work becomes clearer, even such a planned action would not raise the specter that the initial decisions, or the decisions not to recall the higher paid experienced accountant, was based on age rather than a desire to reduce costs.

In a like vein, why would Tom Fry, who *knew* that Roseanne Turner had IT expertise at TFGC, and could at least temporarily handle the transition duties involving the Ben Hogan line, and who *knew* that the Ben Hogan line was going to be handled by Callaway (although the timing changed, the decision never did), be expected to review Lonczak's job history to learn whether he had performed such duties for another company many years before?  What inference of age discrimination can be inferred from a failure to do so?  None.[16]

---

[15]Indeed, the savings came from the layoffs of at least five people by Kelleher, the three cost accountants, a tax accountant, and a business analyst.  To the extent the two new graduates were "replacements', a wholly inaccurate term in this context, they replaced all five for what was being spent on Bettencourt alone.

[16]Without wishing to appear callous, as a legal matter no employer ever needs forego selecting the more senior employee for termination as long as the selection is not for independent age related reasons.  Legal considerations aside, those affected by the non-consideration of seniority have a plausible claim that the failure to consider their seniority is unfair if the Company has previously profited by the employees' past service, and then disregards it when effectuating a layoff.  Here, however, while for benefits Callaway honored the employees' past service (despite the so-called seniority or age bias), no employee worked for Defendant longer than any other.  Moreover, despite the Plaintiff's praise for the employees of the prior company, the fact is that the company lost millions of dollars and was forced into bankruptcy after selling off much of its business.  That kind of recent history does not create much incentive for the purchaser to attempt to retain employees of the prior company.

17

### 2.  Statements regarding "Deadwood", "Seniority" and an Absenteeism Study Fail to Demonstrate Age Bias

Moving to specific "remarks", Plaintiff references a statement by an unidentified woman from Callaway's personnel department that she had never seen a company with so many employees with over 20 years seniority and that, at Callaway, she was accustomed to people who had been there less than 20 years.  The statement does not even indicate that it was perceived as a negative, as opposed to positive observation. In any event, it is not evidence of a corporate age bias.

Nor are the alleged statements of Kelleher or Bosworth referencing "dead weight" or "deadwood."  Plaintiff's Statement of Disputed Facts, as his memorandum, incorrectly claims that Kelleher told John Bettencourt that long-term employees who "are still here all this time" were "deadwood".  However, as detailed in the Response to Plaintiff's Statement of Disputed Facts, the affidavit Plaintiff relies upon does not assert that, but rather, that Mr. Kelleher "complained about long-term employees who 'are still here all this time' <u>and</u> are 'deadwood'".  (Response ¶ 30)  Even if Kelleher thought all long-term employees were deadwood, for the reasons cited in <u>Hazen</u>, such a belief would not support an assertion that such a belief was discriminatory based on age.  But clearly, here the complaint was about people here a long time <u>and</u> were deadwood.  Not only does that not indicate the perception that he thought employees were deadwood if they were long service employees, the materials before the court show that Kelleher expressly told Bettencourt (who was with the company a very long time) that he did not think Bettencourt was deadwood.  (<u>Id</u>.)

18

Similarly, while Bosworth is alleged to have referred to the field sales force as having a lot of dead weight (*See* Defendant's Response to Plaintiff's Statement of Disputed Facts at ¶¶ 12-16)[17], that, too, is not an age related comment, especially in the context of a failing company.  *See, e.g.,* Gartland v. Hermetic Seal Corp., 1990 WL 127529, *2 (D. Mass., 1990) ("Plaintiff further charges that Wong said at one staff meeting, in the context of discussing the reorganization of the sales team, that "we should get bright young people in," and on another occasion that he wanted to "get rid of deadwood."  In the context of a company, which admittedly is in the throes of serious financial difficulties, these statements, even if considered collectively, do not suggest that the election of plaintiff for termination was discriminatory.").  *Accord*, Strickland v. Federal Express Corp., 45 Fed. Appx. 421, 425, 2002 WL 2026385, **4 (6th Cir. 2002) ("Deadwood" likely refers to people who just are not working hard."); Long v. Chesapeake and Ohio Ry. Co., 42 FEP Cases 990, 998 (E.D. Va. 1986) *aff'd.* w/o op., 825 F.2d 407 (4th Cir. 1987) (employees' allegations that union officers referred to them as "old women," "deadwood," "deteriorating" and "stagnant" held insufficient to establish that union acted with age-based motivation).

Straining further, in Orwellian fashion Plaintiff asserts that a pervasive corporate mindset of age bias is further demonstrated by the testimony of Richard Levandowski. The testimony relates to the finance department's periodically reviewing the costs associated with Defendant's relatively high absenteeism amongst its hourly workforce.

---

[17]Again, the Plaintiff's claim that indicates he referred to all the existing employees in such fashion was not supported by his own materials, and discussed in the Defendant's Response to Plaintiff's Statement of Disputed Facts.  Bosworth was also said to have said that "people who had been there over 20 years were "bleeding the company dry."  This, too, relates to an employee's longevity, not age.  What was and was not stated by Bosworth, as supported by the materials submitted by Plaintiff, are dealt with in Defendant's response at length.

19

Not only did this testimony not pertain to office employees, the testimony clearly indicates that the Company simply concluded that its higher costs was a result of the fact that the Company had an older hourly workforce, that such higher costs were simply a cost of doing business, and that no action was therefore appropriate. Indeed, there isn't even a claim that any action was ever taken to reduce such age related costs, or to lower the ages in the factory. The age of the workforce may be noted as the explanation for a higher than expected operating cost without leading to the conclusion that doing so is indicative of age bias in general, or that the termination of people outside the area even being studied was age related. Cf. Dartt v. Browning-Ferris Industries, Inc., (Mass.) 427 Mass. 1, 5, 691 N.E.2d 526, 529 (Mass., 1998) (evidence of employer attempts to contain or reduce workers' compensation claims not probative of handicap discrimination).

Similarly, generic references to the "old regime" or an employee being stuck in the "old ways" simply have no relevance. Thus, in daily speech, few people properly use the term "former" rather than simply saying old. Undoubtedly when the new federal courthouse opens most people will refer to the present building as the "old" federal courthouse, despite its relatively recent vintage. Such comments fall far short of establishing that the speaker had any age bias, much less that it infected the entire company. See, e.g., Moreno Morales v. ICI Paints, Inc., 383 F. Supp. 2d 304, 316 (D. Puerto Rico, 2005) (summary judgment in ADEA case although employee told she was associated with the "old administration" and specifically referred to me as part of the 'old team' that could not learn new things.); Gartland v. Hermetic Seal Corp., 1990 WL 127529, *2 (D. Mass., 1990) (fact that several managers called plaintiff "the old man" at

social events and occasionally at business meetings during the period of his employment does not, without more, suggest that the company is guilty of age discrimination.); Gagne v. Northwestern National Insurance Co., 881 F.2d 309, 315-16 (6th Cir. 1989) (affirmed summary judgment when a manager said that "he needed younger blood" in the company, as it was ambiguous as to whether the defendant meant younger in terms of time at the firm or younger in terms of age."). The comments here, at a minimum, "are readily susceptible to interpretations which are in no sense discriminatory". The house of cards Plaintiff attempts to build on them tumbles accordingly.

### C. The Terminations of Richardson & Gielow Don't Show Corporate Age Bias

The undisputed evidence demonstrates that since September 2003, in light of the consolidation of corporate operations in California, literally hundreds of salaried employees have been terminated. Plaintiff seeks to bolster his case by the testimony of two of these employees, David Richardson and Richard Gielow, who worked as Sales Managers. They worked in different positions, and were terminated at different times by a Vice-President who was not even employed by Defendant when the April layoffs were announced. To this end each has indicated that he was in the protected age bracket, indicated that he was terminated, and has at least raised a dispute as to his performance at the time of their individual termination.[18]

---

[18]Each claims to be the "top performer." As noted in the Response to Plaintiff's Statement of Disputed Facts, such a claim is vague and, in any event, unsupported. However, Bosworth testified that he did not think either were good employees. At his deposition Vaughn Rist testified that Richardson was a good salesman, but had not performed well as manager. Richardson claims that Rist told him otherwise. These disputes would have to be resolved by

Clearly, the evidence, which at most goes to Bosworth's mindset, would be inadmissible and irrelevant to show that other decision makers were biased based on age.  Moreover, such testimony should not be allowed in the case of Paul Duval either, since the obvious factual disputes regarding the reasons for their separation would require mini-trials regarding the separation of two other employees.  (*See* Defendant's Opposition to Plaintiff's Statement of Disputed Facts)[19]

---

the jury if their testimony could have any relevance even as to Paul Duval, terminated by Bosworth.

[19]In its opposition, Defendant noted that although Richardson had not pursued a claim, there is apparently a dispute over their performance, and the reasons for their termination.  As noted there:  "While actual evidence of a corporate mindset of age bias evidenced by the termination of others may be relevant, the mere discharge of an older employee, or even several older workers, whose performance is contested, would not be relevant to establish such a discriminatory corporate mindset, absent a preliminary finding that there was age discrimination in the termination of Mr. Richardson.  Thus, the mere termination of Mr. Richardson when there in fact was a consolidation of sales territories (especially given the literally hundreds of people terminated during this period and the absence of any statistical evidence showing a disproportionate number of older workers being fired), by itself, does not establish age bias by Bosworth much less bias on a corporate-wide basis.  If Richardson's testimony was to the effect that he was told he was being fired due to his age, at least a *bona fide* argument could be made that he should be allowed to testify about his own termination because, that evidence, if credited, would show a bias at least by Bosworth.  However, there is no such evidence offered, merely circumstantial evidence from which Richardson, had he pursued a legal claim, could attempt to convince a jury that an inference of age discrimination could be drawn.  Thus, the evidence is that Richardson was doing a good job and was fired nonetheless does not compel a finding of age bias.  The Company would, of course, be required to rebut any such attempted inference, and present its evidence of Richardson's performance, the changes in the Sales Territories, etc., in an effort to demonstrate that Richardson's departure was not indicative of age bias.  This would, of course, have to be allowed, since if, but only if, the circumstantial evidence relating to Richardson's departure led the jury to first conclude that Richardson's termination evidenced age discrimination, could there even be a plausible assertion that the biases evidenced by Richardson's termination also tainted the decision relating to Paul Duval.  The jury would therefore be subjected to a trial within a trial relating to the consolidation of the outside Sales Force (which included none of the Plaintiffs) in general, and the specific reasons why Richardson was selected as part of the consolidation, all before it could even begin to assess if unlawful motivation caused Richardson's termination.  Only after engaging in that exercise could they determine if the same motivation also tainted the decision to terminate Duval.  "Allowing such evidence would be prejudicial "forcing [Defendant] to respond to each witness's claims, and creating, in effect, several "trials within a trial."  Wyvill v. United Companies Life Ins. Co., 212 F.3d 296, 303 (5th Cir. 2000) *cf*. Goldman v. First Nat'l

Indeed, efforts to prove that their layoff in a reduction of force was age based by citing such testimony, was attempted but clearly rejected by the First Circuit in <u>Goldman v. First National Bank of Boston</u>, 985 F.2d 1113, 1119 (1st Cir. 1993) ("First, Goldman claims that discriminatory animus is inferable from the affidavits of eight former Bank employees, each stating that the affiant was the eldest, or one of the eldest, employees in a particular unit at the Bank and was performing adequately when dismissed pursuant to the reduction in force.  According to Goldman, the fact that several older, long-term employees with satisfactory performance records were terminated could lead a reasonable factfinder to conclude that Goldman would not have been terminated but for his age.  On the contrary, as the district court observed, anecdotal evidence of this sort does little more than "corroborate what was undisputed:  that members of the protected class were terminated as part of the [reduction in force]."  Evidence that eight employees, among the 119 selected for dismissal, were among the eldest in their respective units does not give rise to a reasonable inference that older employees were disproportionately affected by the reduction in force, much less that age discrimination motivated their dismissal.").  The court, both at trial and at this stage should not be diverted into a mini-trial over the separation of two other individuals, amongst hundreds, when those individuals never pursued any claim of age discrimination, and have no evidence that there own terminations were age related, other than their own circumstantial claims.  To say such limited evidence has independent relevance, notwithstanding the absence of statistical evidence of a pattern of age discrimination in

---

Bank, 985 F.2d 1113, 1119 (1st Cir. 1993)  (anecdotal evidence did not give rise to reasonable inferences supporting plaintiff's claim of age discrimination.)".

the layoffs, would be prejudicial, unfair, and unjustified.[20]

### D.  Plaintiff's Argument Against Partial Summary Judgment is Specious

Plaintiff's argument against partial summary judgment boils down to the fact that he asserts that the Company was mismanaged, and if not, it may still be operating as it was.  Thus, he asserts, "no one knows what would have happened in 2005 if the Company had not declined and if so many experienced and successful employees had not been terminated."  However, it is not, and will not be, the role of the jury in this case to decide if the Company was well managed.  It is not, and will not be, the role of the jury in this case, to engage in wild speculation as to whether the alternative universe might exist if this cost accountant rather than that cost accountant was retained.  Partial summary judgment is appropriate when, as here, the facts show that liability would have ceased at some point for non-discriminatory reasons.

There is no claim here that any of the entrepreneurial decisions made by Callaway, including its decision to cease operating as a stand alone unit, and assume responsibility for the Finance and Sales functions in California, was discriminatory or even, in a rational sense, the natural consequence of a discriminatory decision.  Rather, this case involves the termination of a single individual, (four counting the related cases, two cost accountants, a sales planner, and a logistic manager, who claim that they should not have been laid off when they were).  Plaintiff cannot plausibly argue to the court or to a jury that the managerial decisions that make partial summary judgment appropriate, decisions prompted by the continuing losses of millions of dollars and a

---

[20]While such matters are often not actually decided until a motion in limine, it would be counterproductive to allow the case to go to trial based, even in part, on evidence that should be precluded.  Of course, summary judgment here would be appropriate even if testimony of these individuals were considered.

change in the CEO of Callaway itself, would not have occurred if only he were not laid

off when he was.  Similarly, the claim that "in an age neutral environment" where

qualifications and performance were judged fairly, it may well have been appropriate to

continue to offer positions to plaintiffs in California or elsewhere" is, to be blunt,

poppycock.  There is no legal requirement to do so, and no basis for any assertion that

although their purported replacement was terminated (and not offered a position in

California or elsewhere), their employment with Defendant would have continued.

Lastly, Lonczak argues that partial summary judgment would be particularly

inappropriate since "his replacement continued to work in Chicopee through the course

of this litigation."  He presumably is referring to Roseanne Turner, who temporarily left

her IT position to cover for the balance of the transition.  Even with the delay, by

November of 2005 Turner returned to her IT position, a job that Lonczak may or may

not be qualified for, but clearly never held.  There is no question that had the company

waited to layoff Plaintiff until the Ben Hogan integration was completed, ultimately, in

November 2005, making his job a totally nonexistent position, the Company would have

been entitled to do so and would have had no obligation to consider him for Turner's IT

position.  Thus, the fact that Turner continued to work in her former position after

November 2005, a position unrelated to Lonczak's, is not a basis for denying partial

summary judgment.

### E.  The Release Is Effective

Plaintiff notes that many of the cases cited by the Defendant are federal cases.

However, even those cases (and there are several state law cases as well) holding that

OWBPA is limited, decide the underlying release issues based on state law.  To the

previous list Defendant would add, <u>Stonkus v. City of Brockton School Dept.</u>, 322 F.3d 97, 103 (1st Cir. 2003) (holding that effective release of M.G.L. c. 151B claim did not need to satisfy requirements of the Older Worker Benefit Protection Act, stating "her age discrimination claim is pursuant to Mass. Gen. Laws. ch. 151B, which requires none of the pertinent elements of section 626(f)(1)." Further, the fact that the earlier memorandum correctly cites state law on tender back, the Defendant cites <u>Hartlage v, Town of Cohassett</u>, 51 Mass. App. Ct. 1104, 744 N.E.2d 683, 2001 WL 278007 (Mass. App. Ct.) (an unpublished decision of the Appeals Court finding OWBPA inapplicable to c. 151B claim, and holding that failure to tender back precluded action even if there was duress.). Indeed, there is really no *bona fide* argument made that the release was made under duress, or coerced, or that tender back rules are inapplicable. Indeed, to knowingly release a claim a party need not know every fact that might subsequently come forth during discovery or such releases would virtually never be enforceable. Clearly, Plaintiff knew he was in the protected bracket and was being terminated. He knew he was waiving any claim relating to any federal or state discrimination law relating to termination. Does Plaintiff contend that the Plaintiff would have better understood the release if, instead, it released claims under M.G.L. c. 151B? Plaintiff had time to review the agreement with counsel. There is no basis for not honoring the clear intent of the release.

Plaintiff attempts to circumvent the clear meaning of the release by asserting that unlike other plaintiffs, his release was not supported by adequate consideration. He relies on a previous letter addressing severance, which does not indicate one way or the other whether the benefits described were to be contingent on the execution of a

26

release.  However, the Release itself is an integrated document that, at ¶ 8, clearly states "In consideration of the payments made to you under this letter, which are in addition to compensation you would otherwise be entitled to upon separation from Top-Flite . . . ." (Defendant's Statement of Undisputed Facts ¶¶ 117, 118)  What Plaintiff seeks to do is dispute that language with parole evidence.  This he cannot do.

Thus, the First Circuit has clearly indicated that when the document itself is clear and unambiguous, extrinsic evidence will not be sufficient to create a dispute as to the effectiveness of a release.  "Rather, when unambiguous language in the challenged waiver document refutes an employee's representation regarding the circumstances surrounding the waiver, the contract logically must take precedence, at least in the absence of competent evidence of the employee's incapacity at the time he signed the document." Morais v. Central Beverage Corporation Union Employees' Supplemental Retirement Plan, 167 F.3d 709, 67 F.3d 709 (1st Cir. 1999).  The parties executed an Agreement providing benefits in exchange for a release.  An educated man, Plaintiff signed the document acknowledging at the time, that the benefits exceeded anything owed.  He cannot contradict that now.

## CONCLUSION

As this court has recently noted, "the 'liberality' of the summary judgment standard 'does not relieve [him] of the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  See also, Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994) ("When ... defendants invoke Rule 56 and identify a fatal flaw in a plaintiff's case, it becomes the plaintiff's burden to produce specific facts, in suitable

27

evidentiary form, to contradict the flaw's existence and thereby establish the presence of a trialworthy issue."); <u>Medina-Munoz</u>, 896 F.2d at 8 ("The test for summary judgment is steeped in reality.")." <u>Paren v. Craigie et. al.,</u> 2006 WL 1766483 *12 (D. Mass. 2006). Summary judgment is appropriate.

Respectfully Submitted,


   /s/ Jay M. Presser
Jay M. Presser, Esq.
BBO No. 405760
Counsel for Defendant
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   February 2, 2007         Tel. (413) 737-4753/Fax: (413) 787-1941

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Defendant's Reply Brief in Opposition to Its Motion for Summary Judgment* was served upon the attorney of record for each other party via electronic filing on February 2, 2007.

   /s/ Jay M. Presser
Jay M. Presser, Esq.