UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GARY LONCZAK,                    )
                Plaintiff        )
                                 )
                                 )
        v.                       )        Civil Action No. 05-30180-KPN
                                 )
                                 )
CALLAWAY GOLF BALL               )
OPERATIONS, INC.,[1]             )
                Defendant        )


MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Document No. 20)
August 7, 2007

NEIMAN, C.M.J.

        Gary Lonczak ("Lonczak" or "Plaintiff") has filed a two-count complaint alleging

that Callaway Golf Ball Operations, Inc., f/k/a The Top-Flite Golf Company (hereinafter

"TFGC" or "Defendant"), committed age discrimination in violation of Mass. Gen. L. ch.

151B ("chapter 151B") and the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621 *et seq.*, when it terminated his employment in 2004.  Defendant in this

and three other companion cases, *Michael Behaylo v. Callaway Golf Ball Operations,

Inc.*, 05cv30178-KPN ("*Behaylo*"), *John Bettencourt v. Callaway Golf Ball Operations,

Inc.*, 05cv30179-KPN ("*Bettencourt*"), and *Paul Duval v. Callaway Golf Ball Operations,

Inc.*, 05cv30181-KPN ("*Duval*"), has moved for summary judgment.

        For the reasons set forth below, the court believes that a release Plaintiff signed

---

[1]  On June 22, 2007, the court allowed Defendant's motion to amend the case
caption to reflect its recent name change from "The Top-Flite Golf Company" to
"Callaway Golf Ball Operations, Inc."  (See Document No. 53.)

bars his chapter 151B claim, but that there are sufficient facts to allow his ADEA cause

of action to proceed.  Accordingly, Defendant's motion will be allowed with respect to

Plaintiff's chapter 151B cause of action, but denied with respect to his ADEA claim.

I. Background

Were the court to follow Defendant's meticulous lead, it could spend significantly

more time than it already has crafting an even more thorough factual background for

this memorandum and order.[2]  Unfortunately, it would be unfair to the litigants, not to

mention the other cases in the pipeline, to use the court's limited resources that way.

See In re Atlantic Pipe Corp., 304 F.3d 135, 147 (1st Cir. 2002) ("[I]t is trite but often

true that justice delayed is justice denied.").  Accordingly, the court will simply zero in

on the facts material to the parties' dispute, stating them in a light most favorable to

Plaintiff, the party opposing summary judgment.  Douglas v. York County, 433 F.3d

143, 149 (1st Cir. 2005).

For many years, Duval worked for Spalding Sports Worldwide, Inc. ("Spalding"),

a global golf and sporting goods company, at its corporate headquarters in Chicopee,

Massachusetts.  (See Def.'s Mem. in Support of its Motion for Summ. J. in Duval

(hereinafter "Def.'s Brief") at 1.)  By May of 2003, Duval was the Director of Sales

---

[2]  Defendant has presented a Local Rule 56.1 Statement of over fifty pages (totaling over one hundred and fifty paragraphs) in this action, hereinafter Lonczak, as well as a similar such statement in Behaylo, Bettencourt and Duval.  In addition, Defendant has supplied two volumes of exhibits in each case -- one hundred and fifty-six exhibits total -- and Plaintiff has responded with thirty-one exhibits of his own.  By rough estimate, the parties have devoted over twenty-four vertical inches of "facts" and "exhibits" to these four summary judgment proceedings.

Promotion/Planning for International.  (Def.'s Facts[3] ¶¶ 110, 120.)  Behaylo and

Bettencourt, on the other hand, were "cost accountants" and Lonczak was the Category

Logistics Manager.  (Def.'s Facts Re Behaylo ¶ 101; Def.'s Facts Re Lonczak ¶ 101.)

In May of 2003, Spalding, which had been losing millions of dollars annually,

sold its sporting goods division and its "Spalding" brand name to Russell Corp. and

renamed itself "The Top-Flite Golf Company."  (Def.'s Facts ¶¶ 23, 26.)  Even with

these changes, however, the company was forced to file a voluntary petition for

bankruptcy on June 30, 2003.  (*Id.* ¶ 29.)  Shortly thereafter, the Bankruptcy Court

ordered that the company's remaining assets be auctioned.  (*Id.* ¶ 30.)

In September of 2003, a number of the company's assets were purchased by an

entity owned by the Callaway Golf Company.  (*Id.* ¶ 38.)  The new company -- TFGC --

designated itself "The Top-Flite Golf Company, a wholly owned subsidiary of Callaway

Golf Company."  (*Id.*)  On or about September 15, 2003, employees of the former

company, including Plaintiff, accepted a letter offering them "new employment" with

TFGC.  (*Id.* ¶ 40.)  At about the same time, Robert Penicka -- then age 41 -- was

named President.  (*Id.* ¶¶ 37, 53.)

From the time it was created in September of 2003 through the end of that

calendar year, TFGC lost nearly $9 million dollars.  (*Id.* ¶ 83.)  In December of 2003,

Penicka hired Andrew Kelleher -- age 38 -- as Vice President of Finance, filling a spot

---

[3]  The court uses the abbreviations "Def.'s Facts," "Def.'s Ex.," "Pl.'s Facts," and
"Pl.'s Ex." for those facts and exhibits taken from the Local Rule 56.1 Statements in
*Duval.*  Facts and exhibits taken from *Behaylo*, *Bettencourt* and *Lonczak* add the
phrase "Re Behaylo," "Re Bettencourt" or "Re Lonczak" as the case may be.

that had been vacant for about six months.  (*Id.* ¶¶ 54, 55.)  Penicka also fired Michael Esch -- age 47 -- as Executive Vice President of Operations and replaced him with Tom Fry -- age 35.  (*Id.* ¶¶ 15, 56, 57.)  Then, in April of 2004, Penicka fired Louis Tursi -- age 43 -- as Executive Vice President of Sales and Marketing and replaced him with Jamie Bosworth who was in his "thirties."  (*Id.* ¶¶ 58, 60, 117.)[4]

Penicka and his three new "thirty-something" vice presidents, Kelleher, Fry and Bosworth, were all members of the company's eight-person operating committee (referred to as "the OCM").  (Def.'s Facts ¶¶ 17, 63.)  The other four members of the OCM were:  Vaughn Rist (age 62), Vice President of Human Resources; Peter Arturi (age 50), General Counsel; Tom Kennedy (age 48), Vice President of Research and Development; and Christine Rousseau (age 52), Vice President of Information Technologies.  (*Id.* ¶ 63.)

By the beginning of 2004, Kelleher was in charge of Defendant's Finance Department.  (Def.'s Facts Re Behaylo ¶ 101.)  Part of that department was "Cost Accounting" and, by the end of March, there were four "cost accountants":  Behaylo, age 48; Bettencourt, age 49; David Norman, age 38; and the Manager of Cost Accounting, Richard Levandowski, age 55.  (*Id.* ¶¶ 101, 102, 115.)  After conducting an initial evaluation of the Finance Department, Kelleher believed that TFGC was overstaffed with cost accountants and that all cost accounting could be done by one person and that the best person to perform that function was Levandowski.  (*Id.* ¶¶ 115,

---

[4]  Defendant has not supplied Bosworth's age, but Plaintiff asserts, without objection, that Bosworth, Kelleher and Fry, were all in their "thirties" during the relevant time-frame  (Pl.'s Facts ¶ 10.)

117.)

During this downsizing process, in January of 2004, Kelleher made a comment that Bettencourt found "disturbing." (Pl.'s Ex. 8 at 107.) According to Bettencourt, Kelleher commented that "the top management of the company looked at people with a lot of seniority and didn't understand how some people were still there." (*Id.*) Bettencourt testified at his deposition that Kelleher used the expression "deadwood," a term which he then "of course . . . qualified . . . by saying that it doesn't apply to you, John." (*Id.* at 108.) At his own deposition, Kelleher agreed that he had "inherited" the company's Finance Department and that it consisted of "a lot of legacy folks [who] had been around with Spalding." (Pl.'s Ex. 10 at 10-11.) For his part, Levandowski testified at his deposition about conversations he had with Kelleher about the advancing age of many of the manufacturing employees and how such "problems" impacted absenteeism, overtime, and the company's health care costs. (Pl.'s Facts ¶ 35.)[5]

---

[5] Levandowski testified as follows:

Q. Did you ever hear [Kelleher] comment on the age of the employees who were there when he arrived or throughout your tenure?

A. We always talked about the age of the manufacturing group because that seemed to be always one of our problems. It's an elderly workforce and therefore generates additional costs in higher medical insurance, higher costs of those things.

Q. Higher cost of what?

A. Medical costs and that type of cost.

Q. Again, when you say the manufacturing group, that

would include who?

A.  Basically the hourly people.

Q.  These are people involved directly in the manufacture of the balls?

A.  Right.

Q.  When you say "we" would discuss it, you mean who?

A.  Well I would discuss it with Andrew [Kelleher].  We would look at the costs.  We'd have a lot of absenteeism.  If it gets really hot, some of the elder people do not show up as often; it's just the way it is.  It wasn't a statement of degrading anybody, it's just, okay, we have an elderly workforce, we're going to have higher medical benefits, we're going to have higher absenteeism.  It just happens.

Q.  Had someone examined the absenteeism in relationship to the age of the workers?

A.  I believe we had that study done just to get  -- over a brief period of time, eight, ten weeks.

Q.  When was that done?

A.  I couldn't be honest and tell you.  I mean, we would look at it at least once a year just to see what was going on.  Absenteeism was always a big problem.

Q.  When you say "we," now you're talking about who?

A.  If it was absenteeism, we would ask Lynn [Lafond] because at the time she also had payroll so we'd let her do the research and give us with statistics.

Q.  What was the research you were asking her to do?

A.  We'd look and say --

Q.  When you say "we" you mean who?

6

In March of 2004, the OCM (of which Tursi, but not Bosworth, was still a

member) held an off-site retreat to discuss the company's continuing negative financial

_____

> A.  Management -- Andrew, myself, Jim Laughlan, we would
> look at the manufacturing costs, we'd get Tom Fry involved.
> We'd say this is a problem, get into the summer months or
> the high peak periods of production and if you have high
> absenteeism then you have to work overtime to recover the
> same amount of hours.  It's just additional
> expense.
>
> Q.  You're saying that in particular you had asked Lynn
> Lafond to do a study on that?
>
> A.  We would ask to take a look at the absenteeism, is it
> running higher than normal, is it the same.
>
> Q.  Did she produce such reports?
>
> A.  Yes.
>
> Q.  Did you ask that it be analyzed in terms of the age of the
> employees?
>
> A.  Well, we kind of knew which departments were more
> elder than not.  We knew where the younger people had
> been just hired or the younger ones were.  We didn't do it by
> age specific.
>
> Q.  How did you conclude that the older workers were more
> prone to absenteeism?
>
> A.  I didn't say the more elder.  I said we have an elder
> workforce so that leads to lead to higher than normal
> absenteeism.  If you take a look at a younger workforce  --
> and it doesn't matter if it's in this business or not -- you go to
> a younger workforce they have a tendency to not have as
> much absenteeism.

(Pl.'s Facts ¶ 35.)

7

situation.  (Def.'s Facts ¶ 88.)  Kelleher gave a "bleak" presentation that the company

was in financial trouble.  (*Id.*)  Penicka, in turn, gave each OCM manager the task of

assessing how to reduce costs in his or her department.  (*Id.*)  At a follow-up meeting a

week or so later, it was decided that a widespread layoff was in order.  (*Id.* ¶ 89.)  It

was decided as well that the focus was to be on eliminating office functions seen as

non-essential since the full complement of factory employees would be needed.  (*Id.* ¶¶

91, 92.)  Each manager was instructed to come up with a plan to properly staff his or

her organization.  (*Id.* ¶ 92.)

On April 15, 2004, forty-one office employees, as well as seven field sales

personnel, received a letter indicating that they would be laid off immediately with their

salaries continuing through April 30, 2004.  (*Id.* ¶ 93.)  Each letter went on to offer

individualized severance packages which the employees had twenty-one days to

accept or decline.  (*Id.* ¶ 94.)  "In consideration of [such] payments," the letter

continued, the employees were told that they would be releasing Defendant "from all

debts, liabilities, or obligations to you whatsoever, whether known or unknown, which

may now exist, including without limitation, any arising under any federal, state, or local

law regarding employment discrimination or termination."  (*Id.*)

Behaylo (age 48) and Bettencourt (age 49) were two of the employees in the

Finance Department who Kelleher decided to lay off on April 15, 2004.  (Def.'s Facts

Re Behaylo ¶¶ 121, 122; Def.'s Facts Re Bettencourt  ¶¶ 119, 120.)  Behaylo

immediately signed his release and received all the benefits promised him, including

his full salary through June 4, 2004.  (Def.'s Facts Re Behaylo ¶ 124.)  Bettencourt

signed his release on May 4, 2004, and received all the benefits promised him, including his full salary through January 28, 2005.  (Def.'s Facts Re Bettencourt ¶¶ 121, 122.)

Lonczak (age 51), the Category Logistics Manager, was laid off by Fry on April 15, 2004.  (Def.'s Facts Re Lonczak ¶¶ 101, 115-117.)  He immediately signed his release and received all the benefits promised him, including his full salary through August 27, 2004.  (*Id.* ¶¶ 117, 118.)

As for Duval (age 53), Rist, the Director of Human Resources, met with him on April 14, 2004, the evening before the layoffs were announced.  (Def.'s Facts ¶¶ 114, 143.)  Rist told Duval that his position was going to be eliminated as well, but that he should "hang in there" because he may have something for him.  (*Id.* ¶ 114.)  Duval continued to report to work for the next two weeks, and Rist approached the newly-hired Bosworth and encouraged him to interview Duval and "find a spot for this guy." (*Id.* ¶¶ 116-118.)  After meeting with him, Bosworth named Duval Director of Sales Operations.  (*Id.* ¶ 119 & n.11.)  Duval's transfer papers indicated that he would report to Bosworth temporarily, until a Director of Key Account & Sales Operations was filled "shortly."  (*Id.* ¶ 128.)

At about the same time that Bosworth was negotiating with Duval, he was recruiting James "Reid" Gorman, whom he had known for eight years, to be part of his sales management team.  (*Id.* ¶¶ 122, 130.)  Shortly thereafter, Bosworth told Duval that he had hired Gorman -- then age 34 -- and that Duval was to report to him.  (*Id.* ¶ 128; Pl.'s Facts ¶ 20 (sic).)  Duval perceived that Bosworth and Gorman were close

friends.  (Def.'s Facts ¶ 130.)

While this was happening, Bosworth was informed that the company was still losing money and that he needed to look closely at his organization's staffing to determine whether or not certain functions or positions could be eliminated.  (*Id.* ¶ 133.) Accordingly, Bosworth held a meeting of his regional sales managers.  (Pl.'s Ex. 5 ¶ 3.) One of those managers, David Richardson -- who it appears was then age 57 (*id.* ¶ 7) -- remembered that "Bosworth began the meeting by criticizing the existing sales force and making statements, the sum and substance of which were, that the sales force had a lot of 'dead weight' and that people [who] had been with the Company for over twenty years were bleeding the company dry."  (*Id.* ¶ 3.)  According to Richardson:

> He then asked each of us if we would then tell him how many people in each of our regions we were going to replace.  We went around the table with each manager commenting on this. . . . [I]n particular, a Mr. Steve Conley, who had just been hired (age 29), said that of the fifteen salesmen he had, he would replace 9, 10 or 11 of them.  At that in time [sic], Mr. Conley would not have even had the opportunity to meet most of these sales people.  When my turn came, I indicated that there was only one person [who] I would replace and as it happens it was an individual who was in his late 20s.

(*Id.*)  One of the managers, perhaps Richardson, then asked Bosworth "what he was to do because he had a number of sales people who were over 50 and had been with the company for a long time."  (*Id.* ¶ 4.)[6]  "Bosworth responded that he should just fire a

---

[6]  At his deposition, Bosworth was asked if "anyone at the meeting, in response to anything that you did say, suggested that there would be a problem with getting rid of certain members of the sales force."  (Pl.'s Ex. 4 at 33.)  When Bosworth answered "yes," he was then asked if he remembered who he responded to.  (*Id.*)  Bosworth stated: "I don't remember but -- it might have been Dave Richardson saying hey, if we

couple of young guys along with the old ones and no one would notice." (Pl.'s Ex. 5 ¶ 4.)  Four weeks later, Richardson was informed that his own job was being terminated. (*Id.* ¶ 5.)

By June of 2004, Bosworth had come to the conclusion that Duval's position was "not critical" and largely superfluous.  (Def.'s Facts ¶ 134.)  Gorman agreed with Bosworth that much of what Duval was doing could be performed by others.  (*Id.* ¶ 137.)  Accordingly, on July 21, 2004, Bosworth fired Duval.  (*Id.* ¶¶ 141, 143.)

At his deposition, Bosworth was questioned about his views of the company's sales force, in general, and Duval, in particular.  (See Pl.'s Ex. 4 at 25-33.)  He testified, in part, as follows:

> A.  The biggest problem [in the sales department] was that it was being run always looking at past numbers to try to dictate future events. . . . They literally -- I made the statement a lot is that a lot of people there who said they had ten, twelve, thirteen fifteen years of experience and in my opinion they had one year of experience, they just do it thirteen times or fifteen times in a row.
>
>         . . . .
>
> Q.  Who in particular are you talking about?
>
> A.  Oh, most of the sales management team that was there.
>
> Q.  Who is that?
>
> A.  Paul Duval was one that was there that we let go who really concentrated on how things were always done in the past and trying to get back to the way things were done ten years [ago] when the market completely changed. . . .

get rid of some people there might be a lawsuit, an age discrimination lawsuit." (*Id.*)

> Q.  Who was in his group?
>
> A.  He was in Operations. . . . They tried to protect him
> during some shake-outs because he was a very, very
> popular -- really nice guy, great guy, very popular guy in the
> company. . . .
>
> Q.  Who is "they"?
>
> A.  The old regime -- Lou Tursi, that whole group. . . .

(*Id.* at 26-28.)  When asked about "philosophical" differences he had with Duval,

Bosworth testified as follows:

> A.  . . . I actually remember one time -- we had a major issue
> literally a month into my employment there. . . . I called a
> meeting of all the managers.  I remember walking out of the
> room being exasperated with Paul because Paul was telling
> us what we should do from ten years ago and it had no point
> of relevance . . . .  He was just so stuck in the old ways that
> to me didn't make money for the company.
>
>                . . . .
>
> Q.  And you were against the old way of doing things?
>
> A.  I was against the old way of doing things at Top-Flite the
> way they were done; yes.

(*Id.* at 29-30, 34.)[7]

On July 21, 2004, Duval was presented with a separation package which

included a release of claims.  (Def.'s Facts ¶ 144.)  Duval took the package home,

consulted with an attorney, and then executed the release.  (*Id.* ¶ 144.)  Consistent with

---

[7] Still later, Bosworth testified to a conversation he had with the president,
Penicka, about Tursi.  (*Id.* at 140.)  Bosworth stated that he "had no interest in working
with that gentleman" and noted that he had previously "laugh[ed]" at Tursi because he
was "still in the past."  (*Id.* at 140-41.)

the terms of his agreement, Duval received his full salary through April 20, 2005.  (*Id.* ¶ 145.)

At about the same time, on July 15, 2004, Sharon Lally -- age 23 -- was hired as an entry level "Staff Accountant" with a salary of $33,000.  (Def.'s Facts Re Behaylo ¶ 132.)  When Lally was being hired, no consideration was given to rehiring any of the laid off cost accountants, including Behaylo or Bettencourt.  (*Id.* ¶ 133.)  On July 19, 2004, an entry level accountant, Katarzyna Zlobicka -- age 23 -- was hired to work as a financial analyst.  (*Id.* ¶ 135.)  And by the Fall of 2004, a former "peer" of Lonczak, Rosanne Turner -- age 40 -- began to perform about sixty percent of the work that Lonczak had performed.  (Def.'s Facts Re Lonczak ¶¶ 121, 122, 124.)

Meanwhile, in June of 2004 (see Def.'s Brief at 17), Rist, the Vice President of Human Resources, had arranged for TFGC to host a breakfast meeting with the Chicopee Chamber of Commerce.  (Def.'s Facts ¶ 64.)  According to Rist, the reason for the meeting was to bring a level of confidence to a nervous business community and to inform that community that the organization had a new life and was committed to staying put.  (*Id.*)

In a "meet and greet" before the Chamber of Commerce breakfast meeting had begun, several attendees commented to Penicka that his senior staff -- *i.e.*, the OCM who were seated with him at the head table -- appeared "very young."  (*Id.* ¶¶ 67, 68.)  According to Duval, Penicka then said the following in his formal comments:

> You all look up at the head table, you'll notice a lot of young faces up here and that's not by accident, that's by design and in some cases, the people [who] are in the jobs they're in may not even be qualified to be in them yet.

(*Id.* ¶ 69.)[8]  One elderly attendee specifically asked what that meant for older workers at the company, while others commented that they perceived Penicka's comments to be "ageist."  (*Id.* ¶¶ 70, 71.)  Penicka later noted that his remarks were supposed to be an introduction of his "new energetic staff" and had been "taken out of context."  (*Id.* ¶ 71.)

On or about July 15, 2005, Behaylo, Bettencourt, Lonczak and Duval instituted separate age discrimination lawsuits and Defendant promptly removed the complaints to this court on the basis of federal question jurisdiction, *i.e.*, the ADEA cause of action. *See* 28 U.S.C. § 1331.  In due course, the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, Defendant moved for summary judgment, and the court heard oral argument.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For this purpose, an issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't. Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994).  The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact.  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

---

[8]  Other witnesses recall slightly different versions of the comments.  (See *id.* ¶ 69 & n.8.)  The court believes Duval's version is the one most favorable to Plaintiff's position.

"If, after viewing the record in the non-moving party's favor, the Court determines that

no genuine issue of material fact exists and the moving party is entitled to judgment as

a matter of law, summary judgment is appropriate." *Papadopoulos v. Hartford Life Ins.

Co.*, 379 F. Supp. 2d 117, 123-24 (D. Mass. 2005).

III. DISCUSSION

Defendant makes three main arguments: (1) that the release Plaintiff signed

bars his chapter 151B claim (but not his ADEA claim); (2) that no reasonable jury

viewing the merits of Plaintiff's ADEA claim could conclude that he was laid-off due to

age discrimination; and (3) that, even if summary judgment on the merits is denied,

partial summary judgment limiting damages should be granted. Having considered

each argument, the court will allow Defendant's motion with respect to Plaintiff's

chapter 151B claim, deny the motion with respect to Plaintiff's ADEA cause of action,

and deny as well Defendant's request for a partial summary judgment limiting damages.

A. The Release

Upon being laid-off, Plaintiff signed a release of claims in exchange for

severance payments. As described, Plaintiff's agreement expressly released

Defendant "from all debts, liabilities or obligations to you whatsoever, whether known or

unknown, which may now exist, including without limitation, any arising under any

federal, state, or local law regarding employment discrimination or termination."

According to Defendant, this language released it from liability under chapter 151B

and, thus, summary judgment should enter in its favor on that cause of action.

Defendant concedes, at the outset, that the release did not comply with special

15

provisions of an ADEA amendment, the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f), that applies to group waivers which are part of a group incentive plan.[9]  Specifically, Defendant concedes that the OWBPA requires that group exit plans require employees to have forty-five days to review releases (see n.9) and that Plaintiff was given only twenty-one days.  Accordingly, Defendant acknowledges, Plaintiff's ADEA claim is not barred by the release.

Defendant argues, however, that the OWBPA's special release provisions do not apply to releases of *non*-ADEA statutory claims.  *See, e.g.*, *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9 (1st Cir. 1997) (noting that OWBPA requirements do not apply to federal disability discrimination claims).  Rather, Defendant asserts, the touchstone to the enforceability of a release in such instances is whether it is "knowing and voluntary, as evidenced by the totality of the circumstances."  *Id.* at 11.  *See also Morais v. Central Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d 709 (1st Cir. 1999).  According to Defendant, courts generally look at six factors in this regard:  (1) the plaintiff's education, business experience, and

---

[9]  "Congress passed the OWBPA in 1991 as a means of declaring national policy about the circumstances under which an employee could 'waive' a claim of age discrimination in employment.  The OWBPA was codified as part of the ADEA, specifically as subpart (f) of section 626.  The OWBPA, among other things, requires that for a waiver of a claim under the ADEA to be 'knowing and voluntary,' the employer has to write the agreement in language understandable to the average participant, specifically identifying potential claims under the ADEA being waived; has to advise the employee of the right to confer with counsel before signing the agreement; has to afford at least 21 days within which time the employee can 'consider' the agreement (45 days for group exit plans); and has to allow for a period of at least seven days following execution to allow the employee to revoke the agreement."  Lionel M. Schooler, *To Release Age Discrimination Claims, Employers must Comply with the Older Workers Benefits Protection Act*, 35-JUN Hous. Law. 49 (1998).

sophistication; (2) the parties' respective roles in deciding the final terms of the

arrangement; (3) the agreement's clarity; (4) the amount of time available to the plaintiff

to study the agreement before acting upon it; (5) whether the plaintiff had independent

advice, such as the advice of counsel, when he signed the agreement; and (6) the

nature of the consideration tendered in exchange for the release.  *See Smart v. Gillette*

*Co. Long-Term Disability Plan*, 70 F.3d 173 (1st Cir. 1995).

The court agrees with Defendant that the OWBPA's special release provisions

do not apply to chapter 151B age discrimination claims.  *See Stonkus v. City of*

*Brockton Sch. Dep't*, 322 F.3d 97, 103 (1st Cir. 2003) (holding that an "age

discrimination claim [brought] pursuant to Mass. Gen. Laws. ch. 151B . . . requires

*none* of the pertinent elements of [the OWBPA]") (emphasis added).  In addition, the

court agrees with Defendant that the totality of the circumstances favors application of

the release to Plaintiff's chapter 151B cause of action.  First, as Defendant points out,

Plaintiff was a well-educated, sophisticated employee.  Second, Plaintiff cites no

evidence of coercion.  Third, there can be no question, as Defendant contends, that the

agreement evidenced a clear release of chapter 151B age discrimination liability; it

unambiguously applied to "all . . . liabilities . . . arising under any . . . state law

regarding employment discrimination or termination."  Fourth, Plaintiff had sufficient

time and opportunity to review the agreement either alone or with counsel.  And finally,

as Defendant argues, the consideration, multiple weeks of severance payments, was

quite substantial.

Defendant asserts in the alternative that Plaintiff ratified the agreement by

17

retaining the consideration.  According to Defendant, long-established common law

principles preclude a plaintiff from attempting to rescind a release after accepting the

benefits thereunder.  *See, e.g., Vasapolli v. Rostoff*, 39 F.3d 27, 35 n.5 (1st Cir. 1994);

*Abbadessa v. Moore Bus. Forms, Inc.*, 987 F.2d 18, 24 (1st Cir. 1993).  To make this

argument, of course, Defendant has to limit to ADEA cases the Supreme Court's

holding in *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422 (1998), the specifics of

which are described in the margin.[10]

---

[10]  Mrs. Oubre, as part of a termination agreement, signed a release of all claims
which she might have against her employer, Entergy.  *Id.*, 522 U.S. at 423-24.  In
consideration, she received severance pay in installments.  *Id.* at 424.  The release,
however, did not comply with certain requirements of the OWBPA.  *Id.*  Specifically, in
procuring the release, Entergy did not:  (1) give Mrs. Oubre enough time to consider
her options; (2) give Mrs. Oubre seven days after she signed the release to change her
mind; or (3) refer in the release specifically to claims under the ADEA.  *Id.* at 424-25.

After receiving the last payment, Mrs. Oubre brought suit under the ADEA.  *Id.* at
425.  She did not offer to return the money paid to her pursuant to the agreement.  *Id.*
Entergy challenged the lawsuit, conceding that the subject release did not conform to
the requirements of the OWBPA, but nevertheless claiming that, even if the release did
not conform, Mrs. Oubre ratified and validated the release by retaining the monies paid
to secure it.  *Id.*  Entergy also insisted the release barred the lawsuit unless Mrs. Oubre
clearly renounced her rights under the agreement and tendered back the monies
received.  *See id.*

Entergy framed its argument to the Supreme Court within general principles of
state contract jurisprudence concerning ratification and equitable estoppel.  *Id.* at 425-
26.  The Court, reversing a decision by the Fifth Circuit, rejected this position solely
because the subject release did not comply with the OWBPA.  *Id.* at 426-27.  The Court
found that the statutory command of the OWBPA was "clear: An employee may not
waive an ADEA claim unless the waiver satisfies the OWBPA's requirements."  *Id.*
(internal quotation marks omitted).  It further found that Mrs. Oubre's retention of the
proceeds likewise did not amount to a ratification of any document, because retention
did not comply with the OWBPA either.  *Id.* at 427-28.  The Court thus ruled that the
release could not bar the ADEA claim, holding that statutory standards for releases
applied, and that the statutory declaration making nonconforming releases ineffective
controlled the result.  *Id.* at 428.

Defendant's argument as to why *Oubre* is limited to ADEA cases is well-taken but ultimately not necessary for this court ruling as it has. *Oubre* does not appear to apply to anything other than ADEA claims and Plaintiff has cited no case law to that effect. In other words, Defendant's alternative argument -- that Plaintiff ratified the agreement and, hence, stipulated to *not* bring a chapter 151B discrimination claim by retaining the consideration presented to him under that agreement -- could well justify an independent ground for granting Defendant's motion with respect to Plaintiff's chapter 151B cause of action.

Be that as it may, the court adds one final point. Plaintiff argues that a decision from the Massachusetts Commission Against Discrimination ("MCAD"), *McCabe v. Tetley, Inc.*, 22 Mass. Discrim. L. Rptr. 31 (2000), implies that the MCAD has applied the specific requirements of the OWBPA when evaluating a purported release of a chapter 151B age discrimination claim. As indicated, however, the First Circuit has specifically held to the contrary. *See Stonkus*, 322 F.3d at 103. Given this holding and the totality of the circumstances here regarding Plaintiff's specific release, as well as the likely inapplicability of *Oubre*, the court has no choice but to allow Defendant's motion with respect to Plaintiff's chapter 151B cause of action.

B. The Merits

Defendant's second argument questions the merits of Plaintiff's ADEA claim: whether a reasonable jury could conclude that Plaintiff was laid-off due to unlawful age discrimination. On this score, the court concludes that Plaintiff has a stronger argument, at least for summary judgment purposes.

19

The plaintiff in an ADEA discrimination lawsuit bears the ultimate burden of proving that his age was the determinative factor in his discharge, "that is, that he would not have been fired but for his age." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993). At summary judgment, however, the case usually follows the ritualized, three-step burden-shifting paradigm outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (further citations omitted). At step one, an ADEA plaintiff must demonstrate a *prima facie* case of age discrimination. That means, in this reduction in force case, that Plaintiff must show four elements: (1) "that he was at least 40 years old"; (2) "that his job performance met his employer's reasonable expectations"; (3) "that he experienced an adverse employment action"; and (4) "that younger persons were retained in the same position or that the employer otherwise did not treat age neutrally." *Currier v. United Techs. Corp.*, 393 F.3d 246, 254 (1st Cir. 2004).

Defendant does not challenge the first three elements of Plaintiff's *prima facie* case, but argues that the fourth element has not been satisfied. As Defendant must acknowledge, however, the task of making out a *prima facie* case is "not onerous." *Cruz-Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 384 (1st Cir. 2000). And as will be described more fully below at step three, there is ample summary judgment evidence that Defendant "did not treat age neutrally." *See Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 28 (1st Cir. 1998) (noting overlap between plaintiff's third-step burden and the evidence pertaining to his *prima facie* case). This evidence consists

20

mainly of age-related comments made by Penicka and other decision makers.[11]

Step two of the analysis -- which asks whether an employer has "articulate[d] a legitimate, nondiscriminatory reason for its action," *Currier*, 393 F.3d at 254 -- can be dealt with quickly as well.  Plaintiff does not contest Defendant's assertion that the reduction in force was itself a legitimate, non-discriminatory reason for Plaintiff's termination.  Thus, as is often the case in age discrimination cases, both parties focus most critically on step three of the analytical framework:  whether Plaintiff can "show evidence sufficient for the factfinder reasonably to conclude that [Defendant]'s decision to terminate him was wrongfully based on age."  *Connell v. Bank of Boston*, 924 F.2d 1169, 1172 n.3 (1st Cir. 1991).  Or, as more recently described by the First Circuit, the court must "inquire whether the evidence as a whole would permit a reasonable factfinder to conclude that the proffered reason was pretextual and the true reason was an age-based animus."  *Currier*, 393 F.3d at 254 (emphasis omitted).

In the court's view, Plaintiff has presented sufficient evidence for a reasonable jury to conclude that Defendant's decision to terminate him was wrongfully based on age.  Of course, there is no direct evidence to that effect, as the background facts indicate.  But, for summary judgment purposes, the circumstantial evidence can reasonably be viewed to at least point toward unlawful age discrimination.  Most

---

[11] Alternatively, Plaintiff argues that he can meet the fourth element of his *prima facie* case by showing that a "younger person" -- Turner -- "took over" his job after he was laid off.  This may be possible:  Defendant has conceded that Turner, age 40, began to perform about sixty percent of the work that Plaintiff had performed after his furlough.  Such a specific showing on Plaintiff's part, however, is unnecessary.  As indicated, Plaintiff can meet his modest *prima facie* obligation by simply demonstrating that Defendant "did not treat age neutrally."  *Currier*, 293 F.3d at 254.

significant in this regard are the comments made by Penicka -- Defendant's new, and younger, president -- to the Chicopee Chamber of Commerce in June of 2004, just prior to Duval's termination and just after the terminations of Behaylo, Bettencourt and Lonczak.  As described, Penicka invited the meeting participants to "look up at the head table" where the OCM was seated and "notice a lot of young faces."  Penicka then stated "that's not by accident, that's by design."  And, as if that were not enough, Penicka concluded by remarking that, "in some cases, the people [who] are in the jobs they're in may not even be qualified to be in them yet."

Defendant, to its credit, makes a valiant attempt to explain away Penicka's comments.  As examples, Defendant argues that:

- the comments related to the OCM team, not the office staff in general;

- even with the new hires, the OCM was not proportionately young as compared to the general population or workforce;

- Penicka was not involved in the selection of Plaintiff for layoff;

- Penicka was not addressing the termination process at all, but rather was assuring a crowd of anxious business people and TFGC employees that Defendant planned to stay in Chicopee "for the long haul";

- Penicka himself was clearly upset, as he complained at the time, that his comments were perceived as "ageist";

- the substantial layoffs that occurred between approximately April and July of 2004 have never resulted in the creation of a younger staff; and

22

- this was a "solitary" or "stray" remark that was "taken out of context."

In the court's view, however, a reasonable jury could discount these explanations and determine that Penicka's comments were indicative of company-driven age discrimination. The court's reasoning follows.

First, as Defendant points out, a number of circuit courts have taken a hard-line against finding unlawful age discrimination on the basis of a "stray remark" or two. *See, e.g.*, *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (holding that employer's statements that employee had a "low energy level" and was "resistant to change" did not raise an inference of age discrimination); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (affirming summary judgment in age discrimination case despite evidence of comments by supervisors such as "we don't necessarily like gray hair" and "we don't want unpromotable 50-year olds around"); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992) (holding that statement referring to "young blood" are not probative of age discrimination or a discriminatory purpose); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) (holding that a supervisor's statement that he "needed younger blood" was insufficient to create a genuine issue of material fact regarding age discrimination). The First Circuit too has stated that "mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernable evidentiary basis for assessing their temporal and contextual relevance." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001). *See also Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 70 (1st Cir. 2002) (similar). Here, however, the comments were made by

23

the company's president, presented in a forum that was intended to introduce the new company to the community, offered right around the time that Plaintiff and others were being laid off, and immediately perceived as ageist by some. Such context is important. *See Straughn* (holding that "so-called 'stray remarks' may permit a reasonable jury to determine that an employer was motivated by a discriminatory intent," particularly where they were "related to the employment decision in question" and not "made by nondecisionmakers" or "in a situation temporally remote from the date of the employment decision") (citations omitted).

Second, Defendant makes much of the fact that Penicka, although president of the company, was neither Plaintiff's supervisor nor the one who personally decided that he should be laid off. It is undisputed, however, that Penicka hand-picked the three new "thirty-something" OCM members, that the OCM members were collectively pressured to cut staff, and that Plaintiff, an older employee, was one of the office staff targeted for layoff by one of the new, and as it turns out younger, OCM members. In this regard, Plaintiff points to a relatively recent Fifth Circuit decision where the court, in denying summary judgment, credited "evidence that [the company] intended to assemble a younger workforce, creating an inference that [the plaintiff]'s age was a factor in *his* termination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 353 (5th Cir. 2005) (emphasis added).

An even stronger principle, however, is the First Circuit's oft-repeated admonition that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago-*

*Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000) (citing

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998)).  *See also*

*DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (trial courts "should use

restraint in granting summary judgment where discriminatory animus is in issue")

(citations and internal quotation marks omitted).  Applying that admonition here, the

court finds little difficulty in conceiving that the president's possible "intent" or "motive"

to discriminate filtered down to lower level decision makers, including the younger

decision maker who targeted Plaintiff for layoff.

      Third, as Plaintiff observes, Penicka's comments at the Chicopee Chamber of

Commerce are not the only circumstantial evidence of age discrimination surrounding

the corporate transformation at TFGC.  For example, Bosworth, Duval's supervisor,

negatively spoke at one critical meeting about "dead weight" and people who had been

with the company "for over twenty years."  Bosworth also (a) told a manager that he

"should just fire a couple of young guys along with the old ones" when the manager

asked Bosworth "what he was to do because he had a number of sales people who

were over 50 and had been with the company for a long time," (b) criticized the "old

regime," (c) laughed while calling the older man he replaced "that gentleman," and (d)

spoke disparagingly of employees who were "in the past" or wedded to "the old way" of

doing things.  In addition, Kelleher, the new (and younger) head of the Finance

Department and the one who targeted Behaylo and Bettencourt for layoff, made what

could be deemed critical comments about "deadwood," "legacy folks" and "people with

a lot of seniority" who were still at the company.  Kelleher also spoke with Levandowski,

the cost accountant who remained after Behaylo and Bettencourt were let go, about an "elder workforce . . . that leads to higher than normal absenteeism" than a "younger workforce." This evidence, although obviously stated here in a light most favorable to Plaintiff, cannot be disregarded at summary judgment.

In many ways, the First Circuit's decision in *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288 (1st Cir. 1998), upon which Defendant actually relies, is instructive. There, the court was confronted with the question of whether the trial court's admission of "stray remarks" in a gender-based pay dispute was proper. *Id.* at 300. Like here, the remarks by the supervisor over a ten-year period were "unprofessional" if not downright rude. *See id.* at 301 (for example, the supervisor talked with a female employee "about warming up a vial of medicine in her brassiere" and made a remark about another woman's "cleavage"). To be sure, the First Circuit pointed out that the remarks "did . . . not involve the employment decision at issue" (indeed they "did not involve employment at all") and "at least one of the remarks was made several years before any dispute arose over the pay disparity" issue. *Id.* Even so, the First Circuit affirmed the trial court's decision to admit such remarks at trial, noting the deference accorded to trial judges in such matters. *See id.*

Defendant's arguments do to the contrary, *McMillan* demonstrates that the First Circuit is not nearly as stingy in so-called "stray remarks" cases as Defendant would like the court to believe. More importantly, the issue at bar, unlike *McMillan*, does not concern the court's discretionary decision to admit or exclude certain trial evidence, but rather a *pretrial* dispute, *i.e.*, whether the case should even go to a factfinder. In such

26

circumstances, there is a strong argument that the court should be even more cautious than in *McMillan*.

In the end, it is worth repeating that "[t]he role of the trial judge at the summary judgment stage 'is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Hodgens*, 144 F.3d at 167 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  This case provides a perfect example of that principle.  For the reasons stated, Plaintiff has supplied sufficient evidence for a factfinder reasonably to conclude that Defendant's proffered reason to terminate him was pretextual and that the true reason was age-based animus.  Given that genuine issue of material fact, the court can only conclude that Defendant's merits argument does not entitle it to summary judgment with respect to Plaintiff's ADEA cause of action.

C.  Partial Summary Judgment

Finally, Defendant argues that, even if the court rejects its "merits" argument, which it has, partial summary judgment would still be appropriate regarding Plaintiff's claims for damages.  "In light of the radical metamorphosis of Chicopee to a mere manufacturing facility overseen by [California-]based personnel," Defendant asserts, "it is clear that [Plaintiff's] employment with [Defendant] would not have continued even if he was not laid off precisely when he was."  (Def.'s Brief at 29.)

The court deems Defendant's damages argument premature.  Indeed, none of the seven cases Defendant cites in this regard was decided at summary judgment. Accordingly, Defendant's request for partial summary judgment on the issue of

damages will be denied.

IV.  C<small>ONCLUSION</small>

This case is both legally and factually complex.  There are, however, enough

threads to Plaintiff's argument to weave a defense to at least part of Defendant's

motion.  For the reasons stated, the court therefore ALLOWS Defendant's motion for

summary judgment with respect to Plaintiff's chapter 151B cause of action, but

otherwise DENIES the motion.  In addition, the court directs the clerk's office to

schedule a case management conference in this and the three companion cases in

order to establish trial and final pretrial conference dates.


DATED:  August 7, 2007

   /s/ Kenneth P. Neiman
KENNETH P. NEIMAN
Chief Magistrate Judge